691 N.W.2d 611 (2005)
2005 SD 3
The PEOPLE of the State of South Dakota in the Interest of J.S.B., JR., Minor Child and Concerning J.S.B., Sr. and O.L.J., Respondents.
No. 22907.
Supreme Court of South Dakota.
Considered on Briefs on June 1, 2004.
Decided January 5, 2005.
*612 Jennifer Coleman, Dakota Plains Legal Services, Rapid City, South Dakota, Attorney for appellant Father, J.S.B., Sr.
*613 Lawrence E. Long, Attorney General, Ann Holzhauser, Assistant Attorney General, Department of Social Services, Pierre, South Dakota, Attorneys for appellee State of South Dakota.
B.J. Jones, Attorney for Oglala Sioux Tribe, Grand Forks, North Dakota, Attorney for Intervenor Oglala Sioux Tribe.
Thomas J. Van Norman, Senior Tribal Attorney, Cheyenne River Sioux Tribe, Eagle Butte, South Dakota, Attorney for Intervenor appellee Cheyenne River Sioux Tribe.
KONENKAMP, Justice.
[¶ 1.] Under the Adoption and Safe Families Act (ASFA), enacted in 1997, "reasonable efforts" to reunify a family are not required before termination of parental rights when a parent has a pattern of abusive or neglectful behavior constituting an aggravated circumstance. On the other hand, the Indian Child Welfare Act (ICWA), enacted in 1978, provides special rules for the needs of Indian children and families. ICWA requires "active efforts" to reunite families before a parent's rights may be terminated. In this abuse and neglect case, the father, a member of a federally recognized Indian tribe, appeals the termination of his parental rights. During the proceedings, the trial court ruled that ASFA "preempts" the requirements of ICWA, such that "active efforts" were not required in the circumstances. We conclude that ASFA does not override the requirements of ICWA. We affirm the termination of parental rights, however, because despite the court's erroneous ruling, the record reflects that the Department of Social Services (DSS) continued to provide "active efforts" to reunify the family, but such efforts were unsuccessful.

Background
[¶ 2.] J.S.B. was born on December 16, 1999. With both his parents being Native American, he is eligible for enrollment in the Oglala Sioux Tribe (OST), or the Cheyenne River Sioux Tribe (CRST). In July 2000, J.S.B.'s mother and father had an altercation. A deputy was dispatched to the home with a protection order that the mother had obtained against the father. The father told the deputy and a social worker that the mother was smoking marijuana daily, including during her pregnancies, and that the mother had marijuana in the home. J.S.B. was taken into custody and placed in foster care with DSS.
[¶ 3.] A subsequent investigation confirmed that the mother had been using both marijuana and alcohol and that the father had left J.S.B. in the mother's care. The investigation also revealed past occurrences of domestic violence and chemical dependency. An adjudicatory hearing was held on August 31, 2000. J.S.B. was found abused and neglected through the acts and omissions of both the mother and the father.
[¶ 4.] J.S.B. remained in foster care until December 4, 2000. On that date, he was returned to the physical custody of his father. DSS provided various services to the father, including anger management classes and parenting lessons. Full legal custody of the child was given to the father in June 2001.
[¶ 5.] In the next year, the father cared for his child, purchased a home, gave the mother visitation rights, and was gainfully employed. He took J.S.B. to sweats and sun dances, ensuring that his child became acquainted with tribal ways and ceremonies. In November 2001, the father was arrested for a domestic assault. The incident appeared to involve alcohol. In April 2002, the father was again arrested, this time for DUI. Finally, in June 2002, DSS took J.S.B. into custody when the father was found highly intoxicated and walking *614 down the street with the child lagging 60 or 70 feet behind him. He was yelling at J.S.B., age two, to keep up with him.[1]
[¶ 6.] Following the father's arrest, the records show the following contacts:
 On June 3, 2002, a social worker informed the father of the importance of getting a chemical dependency evaluation and also discussed ASFA with him. The worker encouraged the father to remain in touch with her.
 On June 5, 2002, the father left a phone message for the social worker asking that she contact him. The next day, the worker attempted to contact the father, but was unable to reach him. Instead, the worker left a message with the father's employer asking that he return her call.
 On June 7, 2002, the father's attorney told the worker that the father had received permission for supervised visits with J.S.B. The worker agreed to set up the visits and requested that the father come to her office and work out a schedule.
 On June 21, 2002, the father contacted the worker. He told the worker that he was unhappy with the worker's attempts to find a suitable placement for J.S.B. The worker asked the father why he had not attempted to contact her. He responded by questioning why the worker had not attempted to contact him. The worker stated that she had made several attempts to contact him at his place of employment and a companion's home, but was unsuccessful. He then told the worker that he wanted the case transferred to tribal authorities. The worker responded that the issue was not within her authority to decide.
 On July 15, 2002, the worker stopped by the father's home address. He was not home.
 On July 17, 2002, the worker visited the father's place of employment. However, the worker was informed that the father was no longer an employee. That same day the worker also asked the mother if she was aware of the father's whereabouts.
 On July 18, 2002, a hearing was held. The father did not attend.
 On July 22, 2002, the father's attorney notified the social worker that the father had agreed to complete a chemical dependency evaluation. The worker requested that the father contact her.
[¶ 7.] An abuse and neglect petition was filed in August 2002. The petition alleged that ASFA applied because of a documented history of abuse and neglect associated with chronic alcohol and drug abuse and a prior neglect adjudication of J.S.B. The petition asked that DSS be relieved from providing further "reasonable" or "active" efforts to reunite the father and J.S.B. An advisory hearing was held on August 26, 2002. The father did not attend the hearing. Notice was then served on him by publication, and a second advisory hearing took place on September 16, 2002. Because the father again failed to appear, his default was deemed an admission to the petition. The trial court found that DSS had made "reasonable" and "active" efforts to reunite J.S.B. with the father by providing remedial services and rehabilitative programs. By order entered on September 16, 2002, J.S.B. was found to be abused and neglected by the father.
*615 [¶ 8.] In early November 2002, the social worker spoke with the mother who informed her that the father was likely incarcerated. As a result, on November 14, 2002, the worker contacted the jail and learned that the father was indeed an inmate. That same day, the worker contacted the father's attorney who gave her a brief synopsis of the father's situation. The father attempted to contact the social worker on November 21, 2002. On November 22, 2002, the father contacted the worker.
[¶ 9.] In a hearing on December 2, 2002, the trial court ruled that DSS "has made reasonable efforts to reunite the minor child with his parents and will continue to do so[.]" The court also found that DSS "has made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family[.]" Lastly, the court concluded that ASFA "applies and [DSS] is under no obligation to provide services to try and reunite the minor child with his parents."
[¶ 10.] Final disposition hearings were held on April 15 and May 12, 2003. During these hearings, witnesses were presented by all parties. On the second day of the hearings, an attorney from the CRST appeared and moved to intervene. The trial court granted the motion. Then the CRST moved to transfer the proceedings to tribal court. The circuit court denied the motion as untimely.[2] Finally, the tribe's attorney asked whether she would be allowed to cross-examine witnesses. The trial court responded, "Probably not." With that, the attorney said, "There's probably no point in me remaining then," and left. At the conclusion of the hearing, the trial court ruled that ASFA applied to the case and found that DSS made "reasonable" and "active" efforts to reunite the family before the December 2, 2002 ASFA ruling. The court terminated the parental rights of both parents.[3]
[¶ 11.] In this appeal, the father asserts that the circuit court erred (1) in holding that ASFA overrules the provisions of ICWA; (2) in concluding that DSS had made active efforts; and (3) in finding that the least restrictive alternative available was termination of the father's parental rights. In addition, the intervenors, OST and CRST, join the father on Issue I, and contend, in addition, that the trial court erred when it permitted the CRST to intervene in the proceeding below, but prevented it from participating in the final dispositional hearing.[4]

Analysis and Decision
[¶ 12.] Because statutory interpretation is a legal question, our review is de novo. City of Rapid City v. Pennington County, 2003 SD 106, ¶ 5, 669 N.W.2d 120, 121. Under de novo review, we give no deference to a circuit court's conclusions of law. Bozied v. City of Brookings, 2001 SD 150, ¶ 8, 638 N.W.2d 264, 268. However, when we review findings of fact, we give considerable deference to the trial court. SDCL 15-6-52(a). Only when a finding of fact is clearly erroneous will we conclude that the trial court erred. A finding is clearly erroneous when we are left with a definite and firm conviction that a mistake has been made. In re T.H., 396 N.W.2d 145, 148 (S.D.1986).

*616 ICWA and ASFA
[¶ 13.] In 1978, Congress enacted the Indian Child Welfare Act (ICWA) after concluding that (1) it "has plenary power over Indian affairs;" (2) it "has assumed the responsibility for the protection and preservation of Indian tribes and their resources;" and (3) "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." 25 U.S.C. § 1901 (1978). Congress had a particular concern with the disproportionately higher rates of parental terminations with Indian families caused by an insensitivity to "Indian cultural values and social norms[,]" leading to misevaluations of parenting skills and to unequal considerations of such matters as parental alcohol abuse. American Indian Law Deskbook, p. 463 (3rd ed. 2004) (quoting H.R. Rep. No. 95-1386, at 10 (1978), reprinted in 1978 USCCAN 7530, 7532); see also 25 U.S.C. § 1901(4) (1978).
[¶ 14.] The declared policy of ICWA is to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.
25 U.S.C. § 1902 (1978) (emphasis added). This policy acknowledges that Indian children should retain familial, tribal, and cultural ties. As noted in Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989), in enacting ICWA, Congress recognized that placement of Indian children in non-Indian homes was not in their best interests. The Court cited Dr. Joseph Westermeyer's testimony:
"[Indian children] were raised with a white cultural and social identity. They are raised in a white home. They attended, [sic] predominantly white schools, and in almost all cases, attended a church that was predominantly white, and really came to understand very little about Indian culture, Indian behavior, and had virtually no viable Indian identity. They can recall such things as seeing cowboys and Indians on TV and feeling that Indians were a historical figure but were not a viable contemporary social group."
"Then during adolescence, they found that society was not to grant them the white identity that they had. They began to find this out in a number of ways. For example, a universal experience was that when they began to date white children, the parents of the white youngsters were against this, and there were pressures among white children from the parents not to date these Indian children...."
"The other experience was derogatory name calling in relation to their racial identity...."
* * *
"[T]hey were finding that society was putting on them an identity which they didn't possess and taking from them an identity that they did possess."
Id. at 33 n. 1, 109 S.Ct. at 1600 n. 1 (internal citations omitted).
[¶ 15.] To ensure that the best interests of Indian children are protected, ICWA (1) establishes either exclusive or presumptive jurisdiction in tribal courts; *617 (2) grants special intervention rights to Indian tribes; (3) mandates that before an Indian parent's or custodian's rights to a child can be terminated, a finding must be made that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful"; and (4) guarantees that no parental rights will be terminated without a finding beyond a reasonable doubt that "continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1911(a) (1978); 25 USC § 1911(c) (1978); 25 U.S.C. § 1912(d) (1978); 25 U.S.C. § 1912(f) (1978); see generally 25 U.S.C. §§ 1901-1963 (1978).
[¶ 16.] The Adoption and Safe Families Act (ASFA) was enacted in 1997 as a response to congressional concerns that prior legislation "acted as a barrier to the adoption of abused and neglected children." In re D.B., 2003 SD 113, ¶ 10, 670 N.W.2d 67, 70. Under ASFA, in considering reunification of parents with children, "`the balancing formula should tip on the side of protecting children, and not on the side of protecting the rights of parents.'" Id. (following New Jersey Div. of Youth and Family Serv. v. A.R.G., 361 N.J.Super. 46, 824 A.2d 213, 233 (N.J.Super.Ct.App.Div.2003)).
[¶ 17.] ICWA differs from ASFA in its means of promoting Indian children's best interests. ICWA ensures the best interests of Indian children by maintaining their familial, tribal, and cultural ties. It seeks to prevent capricious severance of those ties, whereas ASFA identifies permanency as a major consideration in promoting the best interests of children. A further distinction between the two acts, and at issue here, is the requirement in ICWA that state agencies make "active" efforts to provide services aimed at the prevention of a family breakup. ICWA provides no exception to this mandate. On the other hand, in an attempt to assist states in increasing the speed with which children might achieve the desired goal of permanency, ASFA recognizes certain circumstances under which no "reasonable efforts" may be necessary. ASFA relieves states from making merely perfunctory remedial efforts in cases where a court has found that the parent has subjected the child to aggravated circumstances of abuse or neglect.

Does ASFA override ICWA?
[¶ 18.] The primary question here is whether ICWA's requirement to provide active efforts to prevent the breakup of Indian families is overridden or excused by the provisions of ASFA. The State argues that ASFA relieves DSS of any duty it held under ICWA to provide active efforts to reunite J.S.B. with his father. This is so, the State argues, because ASFA provides that "reasonable efforts ... shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that ... the parent has subjected the child to aggravated circumstances (as defined in State law, which definition may include but need not be limited to abandonment, torture, chronic abuse, and sexual abuse)[.]" 42 U.S.C. § 671(a)(15)(D). The State asserts that either the father "[h]as a documented history of abuse and neglect associated with chronic alcohol or drug abuse" or he "[h]as exposed the child to or demonstrated an inability to protect the child from substantial harm or the risk of substantial harm, and the child or another child has been removed from the parent's custody because the removed child was adjudicated abused and neglected by a court on at least one previous occasion." See SDCL 26-8A-21.1. Thus, *618 the State argues, DSS was under no duty to make active efforts to provide remedial services to the father.
[¶ 19.] SDCL 26-8A-21.1 provides:
Nothing in § 26-8A-21 requires reunification of a child with a parent who:
(6) Has a documented history of abuse and neglect associated with chronic alcohol or drug abuse;
(7) Has exposed the child to or demonstrated an inability to protect the child from substantial harm or the risk of substantial harm, and the child or another child has been removed from the parent's custody because the removed child was adjudicated abused and neglected by a court on at least one previous occasion....
[¶ 20.] SDCL 26-8A-21.1 states that nothing in SDCL 26-8A-21 requires reunification of a child with a parent where the delineated "aggravated circumstances" are present.[5] However, the language of SDCL 26-8A-21.1 specifically limits application of the state-defined "aggravated circumstances" to SDCL 26-8A-21. In no way does the language of SDCL 26-8A-21.1 relieve DSS of its burden to provide "active efforts" as prescribed by ICWA. In sum, while the presence of "aggravated circumstances" may eliminate the need to provide "reasonable efforts" under SDCL 26-8A-21, it does not remove DSS's requirement to provide "active efforts" for reunification under ICWA.[6]
*619 [¶ 21.] If it is perhaps open to question whether our Legislature understood the terms "reasonable efforts" and "active efforts" to be interchangeable, we do not think Congress intended that ASFA's "aggravated circumstances" should undo the State's burden of providing "active efforts" under ICWA. Three rules of statutory construction dictate otherwise. See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1 (2000). First, ICWA clearly offers no exception to its requirement of "active efforts." And ASFA does not mention ICWA, much less state that its exceptions to "reasonable efforts" should apply to ICWA's "active efforts." In fact, no provision in ASFA specifically purports to modify ICWA. It would seem illogical that ASFA would implicitly leave unchanged certain ICWA provisions, like notice to tribes, intervention, and transfer to tribal courts, while modifying others.[7] Second, the rules of statutory construction require that the more specific statute controls. In re T.H.M., 2002 SD 13, ¶ 7, 640 N.W.2d 68, 71. As between the two acts, ICWA is the more specific. ICWA deals with a discrete segment of our population, Native American families, who Congress found were best served by maintaining their relationships with their tribes and extended families. ICWA specifically imposes higher evidentiary standards and different protections for parents whose rights are subject to termination than do termination proceedings under state law. 25 U.S.C. § 1912(d) ("active efforts") and § 1912(f) (proof "supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."). Third, when interpreting a statute pertaining to Indians, the United States Supreme Court has stated, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit...." Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985); See, e.g., Ramah Navajo Sch. Bd. v. Bureau of Revenue of New Mexico, 458 U.S. 832, 838, 102 S.Ct. 3394, 3399, 73 L.Ed.2d 1174 (1982). As Congress found when it enacted ICWA, it is to the benefit of Indian children to remain within their families and only after "active efforts" to reunite those families have proven unsuccessful should the children be removed. 25 U.S.C. §§ 1901-1963 (1978).
[¶ 22.] The State argues that the Supreme Court of Alaska's decision in J.S. v. State, 50 P.3d 388, 392 (Alaska 2002), lends support to the conclusion that ASFA modifies ICWA. In that case, however, the court wrote, "[a]lthough this case is not governed by ASFA, that act is useful in providing guidance to congressional policy *620 on child welfare issues." Id. As the court itself acknowledged, its remarks on this point were dicta. Moreover, we can find no case directly holding that ASFA modifies ICWA, and the parties have cited none. Nonetheless, to the extent that the decision in J.S. can be read to state that ASFA supersedes ICWA, we respectfully disagree with the Alaska Supreme Court.
[¶ 23.] Finally, our decision in the case of In re D.B. is distinguishable. 2003 SD 113, 670 N.W.2d 67. There, we explained that the Indian mother "did not object, present contradictory evidence, or in any way attempt to contest" the application of ASFA by the trial court. Id. ¶ 16. That was not the situation here. Because ASFA does not override ICWA, we conclude that the trial court erred in ruling that DSS was relieved of making "active efforts" to reunite J.S.B. with his father.

Were "Active Efforts" Provided?
[¶ 24.] On December 2, 2002, the circuit court ruled that DSS "is under no obligation to provide services to try and reunite the minor child with his parents." Six months later, the court ruled beyond a reasonable doubt in its final dispositional findings that, up until its ruling of December 2, DSS "made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." We see no error in that ruling, as far as it goes. Furthermore, the court also ruled that the social worker "continued to provide services to respondent father after [its] ASFA ruling." In fact, social worker Wendy Cummings testified that she made such efforts throughout the entire case, both before and after the court's ruling of December 2. The father argues that these efforts were far short of the "active efforts" required by ICWA. Indeed, the trial court did not specifically find that these post December 2 efforts constituted "active efforts." The State contends that these efforts were nonetheless "reasonable" and "active" and points to the father's failure to cooperate with DSS as the primary reason that efforts were unsuccessful.[8] Whether DSS complied with the "active efforts" requirement of ICWA is a mixed question of fact and law. E.A. v. State Div. of Family and Youth Services, 46 P.3d 986, 989 (Alaska 2002). Because we examine mixed questions of fact and law de novo, there is no need to remand this to the circuit court for additional findings. The circuit court found that the post December 2 services were provided. The question is whether they constituted "active efforts."
[¶ 25.] Without question, between July 2002 and November 2002, the father's whereabouts were unknown. DSS could not be required to provide remedial services and rehabilitative programs to an individual who had voluntarily absented himself and could not be located. The father later admitted that he had been on the reservation and had not contacted DSS. At the end of October, he was arrested in the Rapid City area. Through the mother, DSS learned that the father was in jail. A social worker confirmed with the jail that he was incarcerated there on November 14. He was to remain in jail in Rapid City until February 1, 2003. The *621 father called the social worker twice while he was in jail.
[¶ 26.] On January 17, 2003, social worker Cummings met with the father in jail. Despite the circuit court's earlier ruling that "active efforts" were no longer required because ASFA overrode ICWA, Cummings offered a Family Service Agreement to the father. At first, he refused to sign it. He insisted he did not have "any" problem with alcohol.[9] As it had in the past, this latest Family Service Agreement provided that the father would undergo a chemical dependency evaluation and follow its recommendation and that Cummings would assist him with setting up services if he needed assistance. Before Cummings left the jail, both she and he signed it.
[¶ 27.] On February 10, 2003, only ten days after he had been released from jail, the father appeared at a review hearing on this case. He was intoxicated. A later test showed his alcohol level to have been .206. He began an outpatient treatment program in March, but failed to complete it because he said he wanted to work full time. The record reflects that he continued to drink, despite having an AA sponsor and having attended AA meetings. In fact, he admitted to having "two little sips" the Friday before the final dispositional hearing. Under the circumstances, we believe that the mutual Family Service Agreement signed by the father and by the social worker on behalf of DSS constituted "active efforts." When such efforts prove to be "unsuccessful," they are no longer required. 25 U.S.C. § 1912(d).
[¶ 28.] Aside from not making the requisite finding of "active efforts" after December 2, the circuit court's actions complied with ICWA in every other respect. The court received a qualified expert opinion that continued custody of J.S.B. by his father or mother was "likely to result in serious emotional or physical damage to the child." The court found beyond a reasonable doubt that the "active efforts" DSS provided before December 2 were unsuccessful. It also concluded that termination of the parents' rights was the least restrictive alternative available, and that continued custody of the child by either parent was likely to result in serious emotional or physical damage to the child.
[¶ 29.] In conclusion, although the circuit court erroneously ruled that ASFA's aggravated circumstances eliminated the need to provide active efforts to reunite the father with his son after December 2, 2002, the fact is that DSS continued to make those efforts. Under ICWA, DSS was bound by law to make "active efforts" to reunite J.S.B with his father, but it was not required to persist with futile efforts. In re S.D., 236 Mich.App. 240, 599 N.W.2d 772, 775 n. 3 (Mich.Ct.App.1999). Considering that DSS worked with the parents for several years, that J.S.B had been removed from their custody three times because of substance abuse related neglect, that the child has been in foster care for much of his life, and that both parents continued their debilitating substance abuse, termination of parental rights was the least restrictive alternative available and in the best interests of J.S.B.
[¶ 30.] Affirmed.
[¶ 31.] GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.
NOTES
[1] DSS contacted the mother and gave her physical custody of the child. She was arrested and sentenced to jail for DUI in September 2002. DSS then placed the child in foster care.
[2] CRST has not appealed this ruling.
[3] The mother has not appealed this decision.
[4] Although we conclude that it was error for the circuit court not to permit an intervenor to participate in examining witnesses, we conclude that no prejudice has been shown. SDCL 15-6-61.
[5] SDCL 26-8A-21 provides:

The Department of Social Services shall make reasonable efforts prior to the removal of an alleged or adjudicated abused or neglected child from the home of the child's parents, guardian, or custodian to prevent or eliminate the need for removal of the child. If the child has been removed from the home and has been placed in temporary custody of the department, the department shall make reasonable efforts to make it possible for the child to return to the home of the child's parents, guardian, or custodian. If the child is to be or has been removed from the home, the court shall first make a judicial determination that removal of the child from the home is or was necessary because continued presence of the child in the home would be contrary to the welfare of the child and that reasonable efforts by the department to avoid removal of the child from the home have been made. If the child has been removed from the home and has not been returned to the home, the court shall first make a judicial determination that reasonable efforts have been made by the department to return the child to the home and that the child cannot be returned to the home because it would be contrary to the welfare of the child.
Reasonable efforts to prevent the necessity for removal of a child from the home of the child's parents, guardian, or custodian and reasonable efforts to return the child to the home mean provision by the department of any assistance or services that:
(1) Are appropriate for the child's parents, guardian, custodian, or any other caretaker family of the child existing at the time of removal or possible return of the child, including instruction on parenting;
(2) Are available pursuant to the comprehensive plan of preventive services of the department;
(3) Could be made available without undue financial burden on the department; or
(4) Would have a significant likelihood of protecting the child from substantial danger to the child's physical health or from severe emotional damage while enabling the child to remain in the home or to be returned to the home.
In determining the adequacy of reasonable efforts, the court shall consider the assistance, services, and efforts of the department. The court shall also consider the good faith efforts or the lack of good faith efforts made by the child's parents, guardian, custodian, or other caretaker family to cooperate with the department and to effectively utilize the assistance or services for the benefit and welfare of the child.
Id.
[6] ASFA does not prohibit States from making active or reasonable efforts to reunify families. ASFA states that "reasonable efforts ... shall not be required to be made" where, among other things, State defined "aggravated circumstances" exist. 42 U.S.C. § 671(a)(15)(D) (emphasis added). Such language does not preclude laws requiring active or reasonable efforts at the State's discretion.
[7] Though not binding authority on this Court, the federal agency charged with implementing ASFA explains that "[a]lthough we can affirm that States must comply with ICWA and that nothing in this regulation supersedes ICWA requirements, we cannot expound on ICWA requirements since they fall outside of our statutory authority." Title IV-E Foster Care Eligibility Reviews and Child and Family Services State Plan Reviews, 65 Fed. Reg. 4020, 4029 (Jan. 25, 2000) (codified at 45 CFR §§ 1355-1357 (2000)). See Sheri L. Hazeltine, Speedy Termination of Alaska Native Parental Rights: The 1998 Changes to Alaska's Child in Need of Aid Statutes and Their Inherent Conflict with the Mandates of the Federal Indian Child Welfare Act, 19 ALASKA L. REV. 57, 68 n. 67 (2002).
[8] The State concedes that "a finding that DSS is relieved from making `active efforts' as to the offending parent would not necessarily relieve DSS from its obligation to make `active efforts' as to the Indian family nor would the finding relieve DSS from efforts to place the child with members of the child's extended family, members of the child's tribe, or other Indian families as required by the placement preferences under ICWA, thereby maintaining the child's contacts with his tribe and culture." Indeed, in accord with ICWA, J.S.B. was placed with the mother's Native American sister on March 31, 2003.
[9] He had last successfully completed alcohol treatment in 1986.