#23453-a-JKK

**2006 SD 28**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

IN THE MATTER OF THE
GUARDIANSHIP AND CONSERVATORSHIP OF
A.L.T. & S.J.T., Minor Children

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE STUART L. TIEDE
Judge

\* \* \* \*

TAMARA D. LEE                    Attorney for grandparents
Yankton, South Dakota            appellants E.S. & C.S.

CYNTHIA M. BERREAU               Attorney for appellee
Sioux Falls, South Dakota        mother.

ROBERT L. SPEARS of
Spears Law Office                Attorney for appellee
Watertown, South Dakota          father.

\* \* \* \*

CONSIDERED ON BRIEFS
ON FEBRUARY 13, 2006

OPINION FILED **03/22/06**

#23453

KONENKAMP, Justice

[¶1.]　　　In this case, what began as a divorce, ended as a custody dispute between the parents and the maternal grandparents. Because the parents were unable at first to independently care for their two little girls, the grandparents agreed to care for them. They have done so since birth. Eventually, the grandparents obtained guardianship. Over the next several years, issues concerning visitation and custody of the children were extensively litigated between the grandparents and the parents. In the end, the circuit court terminated the guardianship. The court found that the parents were fit and awarded sole physical custody to the mother, with the father given scheduled visitation. Further, because the court found that the grandparents had deliberately alienated the relationship between the father and the children, the court imposed several restrictions before the grandparents could have visitation with the girls. Now, the grandparents appeal the termination of the guardianship and the court's decision to restrict their visitation. Although there is evidence in conflict, we cannot say that we have a definite and firm conviction that the circuit court judge was clearly erroneous. Therefore, we affirm.

## Background

[¶2.]　　　The mother and father (L.D.T and P.D.T.) were married on May 14, 1994, and are the biological parents of A.L.T. and S.J.T, twin girls born on October 22, 1994. After the children were born, the mother, father, and children moved in with the mother's parents, E.S. and C.S. This arrangement continued for six months, until the mother and father moved into a home that was under

construction. When the parents moved out, however, the girls remained with the mother's parents because the new home was not yet suitable for children.

[¶3.] Over the next several years, the mother regularly visited the children at her parents' home and occasionally provided financial support. The father's visits were intermittent, and little or no support was provided. At no time, however, did the girls leave the maternal grandparents' home to live with their parents. On May 25, 1999, the mother sued the father for divorce in Turner County, South Dakota. While the divorce was pending, and because the girls had always remained at the maternal grandparents' home, the grandparents petitioned for temporary guardianship of the children in Minnehaha County, South Dakota. The court granted the temporary guardianship on December 8, 1999.

[¶4.] The father moved to dismiss the temporary guardianship on January 7, 2000. One month later, and before the motion to dismiss was addressed, all parties stipulated to a change of venue on the guardianship matter from Minnehaha County to Lincoln County, and an order was entered to that effect. Then on August 11, 2000, a hearing was held in Lincoln County on the father's motion to dismiss. The court, per Judge Bogue, ordered that the temporary guardianship be continued pending further hearing on the custody issues in the underlying divorce action in Turner County.

[¶5.] At this same hearing, the court ordered that the mother and father shall be entitled to supervised visitation at "such dates and times to be mutually agreed upon by and between the parties and their legal counsel upon reasonable advance notice." The court also required the mother and father to pay the

grandparents child support, in accordance with the South Dakota guidelines.[1]

Lastly, the court appointed Deb Langenfeld of Great Plains Psychological Services to counsel the children and make recommendations regarding visitation with the parents.

[¶6.]    In the divorce action in Turner County, Judge McMurchie took judicial notice of the pending guardianship in Lincoln County and then declared that the temporary physical and legal custody of the children should remain with the grandparents.  But the court also stated that the mother and father shall continue to have supervised visitation based on the recommendations of the court appointed expert, Langenfeld.  Further, in its December 12, 2000 order, the court joined the grandparents as interested parties in the divorce action.[2]

[¶7.]    The mother and father exercised their rights to visitation with the children at the Visitation Center in Sioux Falls.  These visits were supervised, videotaped, and a record was made documenting each visit.  The record detailed the interactions between the parents and the children, as well as the conduct of the grandparents.[3]  Langenfeld, as the court-appointed therapist for the children, also

---

1.    The court ordered the mother and father to pay the grandparents, "as support for the minor children, the sum of $265 each per month, in accordance with the Child Support Guidelines of the State of South Dakota" and "shall split equally (50/50) any medical, dental, orthodontic, counseling, pharmaceutical, or optical expenses not covered by [the grandparents'] insurance."

2.    The statutory authority for joining the grandparents as guardians was SDCL 26-5A-10, which has since been repealed.  *See* SDCL 26-5A-10 (repealed SL 2005, ch 137, §43).

3.    These records were entered into evidence at a subsequent hearing and are part of the settled record in this appeal.

kept a record of her treatment of the girls and her recommendations for the future with respect to the parents. A review of her record is essential.

[¶8.] On October 24, 2000, Langenfeld wrote a letter to the attorneys involved and summarized the children's progress. She recommended that the children continue to have supervised visitation with their parents. She also noted that both girls expressed a fear of their father because they claimed he was violent. She noted that reunification is a slow process, recognizing that the grandparents have been the only consistent and stable element in the children's lives. In describing a visit between the father and the girls on December 10, 2000, Langenfled reported that the father was relaxing more.

[¶9.] In January 2001, Langenfeld indicated that the grandparents may be overacting in front of the children and that the children were picking up on the grandparents' stress. Langenfeld sent another letter to the attorneys on February 28, 2001. Even though neither parent had been highly involved in the children's lives in the past, and the grandparents had been left with the responsibility of parenting them, she declared that "[t]he why and wherefores of the past reasons for lack of contact are not as important as is the need now for visitation continuity and furthering the development of a relationship between the girls and each parent."

[¶10.] In her assessment of the mother, Langenfeld stated that she had had only minimal contact with her, but through the girls had learned that the mother had been visiting them on a daily basis. Langenfeld could not comment on the quality of the mother-child relationship, as she had nothing from which to do so. However, with respect to the father, she noted that it had been difficult for her to

work on reunifying the children with him because of "the ongoing caviling that takes place, as well as the covert and overt messages and coding that takes place from the adults around the children." Specifically, Langenfeld was concerned "with the quality and the amount of negative messages the [children] are getting about their father through/from the grandparents." The grandparents, however, relayed to her that they were in fear for the children's safety and only desired to keep them protected. Langenfeld discussed with them that their issues with the father were only interfering, contaminating, and fueling the loyalty issues with the girls.

[¶11.]     In summing up, Langenfeld remarked that she needed to continue to monitor the covert and overt contamination by all adults involved. She also stated that it would be helpful if everyone would begin to regard the children's biological father as "dad" in front of them. This was because the children were calling the grandparents mom and dad, and addressing their biological parents by their respective first names. Because as a whole the visitations were going well and the children were beginning to bond with their father, she also recommended that the therapist-supervised visitations cease and supervised visitation with the father be allowed with his family. If all were to go well, Langenfeld would recommend that the father receive regular visitation as allowed under the South Dakota guidelines.

[¶12.]     On her recommendations, the father exercised supervised visitation at his brother and sister-in-law's home on April 14 and 28, 2001, in Minnesota. The girls were six at the time. Two days after the second visit, on April 30, 2001, the grandparents reported that the father sexually abused the children in Minnesota during the overnight visit. According to the grandparents, on a walk after school

one afternoon, one of the girls stated that "her potty thing hurts." When questioned by the grandparents, the child stated that "[the father] hurt my potty thing" and that he "used his finger." The other child stated that the father had come into the room she was sleeping in and had "stuck his thumb in her potty thing, and it hurt."

[¶13.] The grandparents took the girls to the emergency room, where they were examined by medical personnel. On May 8, 2001, a forensic interview and medical examination were done with both children at Child's Voice Evaluation Center, by Colleen Brazil and Dr. Rich A. Kaplan, a pediatrician. The interview was videotaped and recorded through written documentation. Dr. Kaplan, in his examination of the children at Child's Voice, did not find any abnormality, trauma, injury, or other evidence of sexual abuse. Nevertheless, in his assessment and examination of the girls, Dr. Kaplan concluded that sexual abuse was possible.[4] Law enforcement was contacted.

[¶14.] The South Dakota authorities conducted a preliminary investigation in South Dakota, but because the incident allegedly occurred in Minnesota, further investigation was conducted by Minnesota authorities. The Minnesota investigator, John Nuernberg, interviewed the father's sister-in-law, viewed the videotapes from the children's interviews, met with the South Dakota authorities and reviewed their case file, and spoke with the children's therapist. However, no agency in South Dakota or Minnesota ever brought criminal charges against the father.

---

4. Even though his initial report stated "possible" sexual abuse, Dr. Kaplan, in his testimony at a hearing on March 22, 2002, reported that he would now say "probable" sexual abuse.

[¶15.] After the sexual abuse allegations, visitations between the father and the girls ceased, but the children's counseling continued. Even though the abuse was not substantiated, the grandparents continued to express fear for the children's safety. On May 15, 2001, Langenfeld explored with the girls what had reportedly happened. After her session, she remarked that she was unsure of what to make of the children's statements "since questioning and the children's reactions by [the grandparents] will have high influence—answers in line with what [the grandparents] reported to me." Langenfeld indicated that she would be transitioning this case over to a new therapist as she was leaving Great Plains.

[¶16.] In June 2001, Patricia Brady took over Langenfeld's responsibilities with counseling the girls and documenting their treatment. Brady first conducted a preliminary assessment of the children. On June 27, 2001, she established certain treatment goals, which included building a level of trust. She, like Langenfeld, had concerns regarding the grandparents expressing negativity about the father in front of and to the children. Brady determined that the environmental factors were contributing to the children's trust and loyalty issues. As a result, on July 11, 2001, Brady spoke with the grandparents about this and asked them to bear in mind the confusion the children must feel due to the conflict. She further discussed with the grandparents their responsibility to not speak negatively about the children's parents in front of them.

[¶17.] During the children's July 24, 2001 session, Brady learned that the grandparents had told the girls that they did not have to see their father anymore. She also learned that their mother continued to see them on a regular basis at the

grandparents' home. Based on this information, Brady planned to work with the girls on clarifying their feelings with what they were being told and identifying certain methods that would assist them in protecting themselves. In October 2001, Brady noted that the girls still did not want to see their father and were fearful that he would take them. Brady continued to work on building trust and assisting the children in identifying and sorting out their feelings about the parental conflict.

[¶18.]     On September 26, 2001, Dr. Andre Clayborne from Great Plains wrote a letter to all the attorneys as an update on the children's counseling progress. The letter reported that the children seemed to be adjusting to the sessions with Brady. Also, the letter indicated that no recommendation could be made with respect to resuming visitation with the father because of the alleged sexual abuse. Further, the letter suggested that taking the matter for resolution through the court might be appropriate.

[¶19.]     Therefore, the father, in his desire to resume visitation with his children, petitioned for dismissal of the guardianship. This came after the mother and father stipulated to a settlement in the divorce action. They left the custody issue to be determined at a later time. Judge McMurchie, in Turner County, held a hearing concerning the guardianship on March 21 and 22, 2002. The court took testimony from the mother, the father, the grandparents, Dr. Kaplan, who had examined the children at Child's Voice, and then Dr. Clayborne, Jeff Trammell, and Patricia Brady, from Great Plains. The court also admitted into evidence all the records from Langenfeld's treatment and recommendations. Lastly, the court

accepted and considered evidence from the parties relating to the alleged sexual abuse.

[¶20.]     At the conclusion of the hearing, the court orally ordered that the father have visitation with his children.[5]  The visitations were to be supervised and occur on weekends at the Visitation Center in Sioux Falls.  The court required that the father submit to a psycho-sexual evaluation by Jeffrey Trammell of Great Plains, who would then prepare a report with his findings and recommendations.  The father was examined by Robert Packard, a licensed psychologist.  Both Trammell and Packard concluded that there were no presentations that indicated a pattern of psychological difficulties.[6]

[¶21.]     After the hearing, the father complained that the grandparents were defying the court order by frustrating the scheduled visitations.  The grandparents, on the other hand, asserted that it was the girls who refused to see their father.  The grandparents insisted that the children refused to get dressed, became defiant, and threatened to run away if forced to go on the scheduled visitations.  The

---

5.     On June 6, 2002, the court entered a written order that set forth the father's right to visitation with his children.  The court acknowledged "that the father has not had the opportunity to visit his children for approximately one year.  This Court is of the opinion that this is too long.  The goal of the counseling recommendations and visitation plan is to reunify the children with both parents."  The court also granted the mother and the father a divorce for irreconcilable differences.

6.     The father was administered another polygraph examination by Great Plains.  Even though some of the father's answers were considered deceptive, Trammell could not find any factual basis from which to conclude that the sexual abuse occurred.

grandparents, "sick at the turmoil and distress this is causing the children," claimed that they did not know what to do next.

[¶22.]    Because the father was still having difficulty exercising visitation, he moved to further establish his rights. The court held a telephonic hearing on July 10, 2002, in Turner County. Judge McMurchie entered another order on August 1, 2002, affirming his previous decision to allow the father visitation in accord with the written order entered on June 6, 2002. Further, the court appointed Richard Johnson as the attorney for the children and ordered that he contact Brady to discuss what should be done to get visitation back on track. Brady and Johnson met in August and established a proposed visitation plan.

[¶23.]    After meeting with the children's attorney, Brady wrote a letter to Judge McMurchie on September 25, 2002. She noted that the continued purpose of the counseling was to reinstate visitation with the father and children. She stated, however, that the children were resisting such attempts and noted that the girls were telling her that, she was making them see their father and "I don't want to talk to you." She also expressed concern about the children's growing anxiety and agitation regarding counseling. In addition to their fear of their father, Brady commented that the children were now verbalizing a distrust of their mother. According to Brady, though, the children's "remarks [were] mirroring comments made by the [grandparents] and other family members." She stated that the negative statements have increased the children's fears and anxieties. Therefore, she declared that "[a]s of September 25, 2002, all counseling sessions have been

stopped until the court can determine a course of action, due to [her] concern of victimization of the children."

[¶24.]     In reference to Brady's September letter, the children's attorney requested a hearing in October 2002, to determine a further course of action in regard to the custody and visitation of the children. The grandparents moved for a continuance and a change of venue from Turner County to Lincoln County in December 2002. After a telephonic hearing on the matter, Judge Gienapp entered an order on January 23, 2003, granting the change of venue and requiring that the father continue to have visitation on every weekend at the Visitation Center in Sioux Falls until further order of the court.

[¶25.]     Now in Lincoln County, Judge Tiede held a hearing on February 7, 2003, to determine the future plan for reinstating visitation with the father. On February 27, 2003, the court entered an order requiring that visitation continue as set forth in Judge McMurchie's oral order and his subsequent August 5, 2002 order as modified by Judge Gienapp's January 23, 2003 order.

[¶26.]     On July 15, 2003, the father petitioned the court for unsupervised visitation. Hearings were held on August 11 and 26, 2003. Judge Tiede considered the issue of the alleged sexual abuse through testimonial and documentary evidence. In addition to their own testimony, the grandparents and the father also offered expert testimony: Adrianne Fricker-Elhai for the grandparents and Patricia Brady for the father. Before entering his decision on visitation, Judge Tiede "reviewed all the files including the record from both Turner County and Lincoln County, all the transcripts that [were] part of the [c]ourt file or in the personal files

of Judges McMurchie and Gienapp, the Child's Voice videotapes of the interviews of [the children], and the videotapes of five visitation sessions by [the father] with the children at the visitation center in the time period from January through March 2003."

[¶27.]		Ultimately, on February 18, 2004, Judge Tiede issued an exhaustive thirty-eight page memorandum opinion detailing and assessing the complex legal and personal history of the case.  The court found

> by the greater convincing force of the evidence that the grandparents have intentionally, deliberately, maliciously and wrongfully prevented [the father] from exercising his lawful rights of visitation with his children.  They have improperly and maliciously influenced [the children] by their words and conduct in a deliberate effort to alienate these children from [the father]. They have repeatedly and flagrantly refused to comply with the lawful orders of four separate judges, all of whom have ordered visitation for [the father].  The evidence in support of these findings is overwhelming, beginning with the records of Ms. Langenfeld, the children's initial therapist extending back to 2000.

On the sexual abuse accusation, the court set forth a detailed analysis of the allegations made by the grandparents and the children, the investigations by the South Dakota and Minnesota authorities, the children's interview at Child's Voice, and the results of the father's polygraph tests.  The court evaluated this evidence and concluded that based on the evidence no sexual abuse had occurred.

[¶28.]		With respect to the polygraph tests, which the grandparents placed significant emphasis on, the court stated:

> I completely discount the polygraph for several reasons.  First of all, the polygraph evidence is not admissible in South Dakota.  It is not admissible because polygraphs are inherently unreliable. Secondly, the police administered the polygraph in the course of an allegation of sexual abuse with no credible evidence to

support such allegations. This polygraph was administered clearly in an effort to induce [the father] to confess or admit culpability. The allegation that he failed the polygraph was made in an effort by the police to obtain a confession from [the father]. [The father] continued to profess his innocence. The questions to which the responses of [the father] were deemed deceptive were general and non-specific.

[¶29.] In the end, the issues whether the guardianship should continue and whether the children were sexually abused were clearly matters of credibility, and the court found the grandparents to be not credible:

> I have been asked to believe that a father desperately fighting to have visitation with his children would on the first opportunity that he was given to have overnight visitation with his children, while in the home of his brother and sister-in-law, and while at least the sister-in-law was present, went into a bedroom where [one child] was sleeping with four other children, took all of his clothes off, took all of the clothes off of [the child], had sexual intercourse with [the child], [the child] screamed and [the father] threatened her and threatened to kill the Grandparents, and then took [the other child] into the bathroom where he touched [that child] in her vaginal area with his thumb outside of her clothes. I am asked to believe this by a Grandmother who has not just a dislike for [the father], but a real hatred of the man. I am being asked to believe this by a Grandmother who prior to the allegation of sexual abuse had done everything within her power to frustrate visitation and the reestablishment of any relationship between these children and [the father]. I am being asked to believe this by a Grandmother who just a month and a half prior to the allegations told a therapist that she is worried something will have to happen before the girls can be safe again. I am being asked to believe this by a Grandmother who is the person who made the initial report of sexual abuse. I am being asked to believe this by a Grandmother who knew that the therapists were reporting that visitations were going well between [the father] and the children and the therapists were recommending that supervision by the therapists end and that transition be made ultimately to unsupervised visitation with [the father]. I am being asked to believe this by a Grandmother who knew that the therapists were reporting that the principal cause of the children's problems in their behavior in school, and otherwise, was the Grandmother.

> Not only is there very little evidence of sexual abuse, there is no credible evidence.

[¶30.] Along these same lines, the court addressed the grandparents' several petitions for protection orders against the father. The latest was September 8, 2003, the fourth protection order they requested.[7] This petition alleged that the father sexually abused the children, but was "in complete contradiction to the earlier allegations which were thoroughly investigated by Minnesota law enforcement officers, Child's Voice, and the children's therapists." Based on this, the court ruled that the grandparents "have wholly failed to sustain their burden of proof to prove domestic abuse by a preponderance of the evidence." The court rejected the allegation and dismissed the case "as not being supported by any credible evidence."

[¶31.] The court concluded that no reason existed to deny the father visitation with his children. On March 3, 2004, it entered an order that established the schedule for unsupervised visitation between the father and his children.[8] On March 15, 2004, the father requested a change in custody and termination of the custodial guardianship. At the time of the hearing, however, the children had been

---

7. The first protection order was filed in 2001, and was dismissed for the grandparents' failure to appear for the hearing. The second and third petitions were from January 2003, and alleged the same instance of sexual abuse from 2001. The petitions were dismissed by Judge Tiede because the grandparents failed to "provide sufficient evidence to support, by a preponderance of the evidence, a finding that domestic abuse between a family or household member had occurred."

8. The court's findings of fact and conclusions of law from the February 2003 hearing were entered on August 18, 2004.

admitted to Avera McKennan Hospital in Sioux Falls. The grandparents took the girls there to receive treatment for their anxiety and depression. The children were still in the hospital when the custody hearing was held on March 22 and 25, 2004.

[¶32.]     The court heard testimony from the mother, the father, the grandmother, and Jeff Hayes, a pastor in the community contacted by the grandparents. At the conclusion of the hearing, Judge Tiede orally ordered that the mother and father be given temporary joint legal custody of the children. The mother received sole physical custody, and the father received unsupervised visitation as previously set forth by the court.

[¶33.]     Because this was a temporary custody arrangement, the father moved for a modification and a hearing was scheduled for May 25, 2004. At this hearing, the court heard further testimony from the mother, the father, the grandparents, the father's sister-in-law, and Erin Olson, a home-based therapist who had been referred to the mother from Avera McKennan. The court entered a written order on August 18, 2004. In forty-two factual findings and fifteen conclusions of law, the court ruled that the guardianship should be terminated. The court found that from the time temporary custody was transferred to the mother, the children's anxiety levels had "markedly decreased," and their performance in school remained constant for one child and improved for the other. Also, the school counselor, who the court found to be credible, "reported that the children seem less fearful than they were in March of 2004."

[¶34.]     Nevertheless, the grandparents continued to insist that the father had sexually abused the children and the children needed protection. In this respect,

the court noted that it "has consistently ruled it is more probable than not that the sexual abuse supposedly perpetrated by [the father] never happened and such allegations are false." The court found that since physical custody has been given to the mother, the children's visitations with the father have gone reasonably well. Also, the court concluded that the children were not acting fearful around him and were enjoying themselves.

[¶35.] The court further found that the mother's and father's home environments were stable, that they had the capacity to provide for their children, and that both parents were fit. Therefore, the court ordered that, in the best interests of the children, the mother and father would share joint legal custody of the children and the mother would have sole physical custody. The court denied the grandparents visitation with the children unless the mother consented to the visitation, advance notice of such was given to the father and his attorney, the visitation was recommended by the children's counselor, and the visitation was specifically authorized by the court.

[¶36.] Consequently, the grandparents brought this appeal asserting the following issues: (1) Whether the circuit court erred in terminating the guardianship over the children; (2) Whether the circuit court erred in ruling that the grandparents could not see the children unless certain stringent requirements were met.

### Standard of Review

[¶37.] Our standard of review is of critical importance in cases where the outcome turns on the credibility of witnesses. Under the rules of appellate review,

we are not free to retry the case as if it had never been heard before. A circuit court's factual findings are reviewed under the clearly erroneous standard. Meldrum v. Novotny, 2002 SD 15, ¶18, 640 NW2d 460, 463 (quoting Langerman v. Langerman, 336 NW2d 669, 670 (SD 1983)). This means that we must give "considerable deference" to the trial court's findings. *In re* J.S.B., Jr., 2005 SD 3, ¶12, 691 NW2d 611, 615 (citing SDCL 15-6-52(a)). We are bound to "give due regard" to the judge's unique opportunity to assess whose testimony is more deserving of belief. *Meldrum*, 2002 SD 15, ¶18, 640 NW2d at 463 (quoting *Langerman*, 336 NW2d at 670). Findings are clearly erroneous only "when we are left with a definite and firm conviction that a mistake has been made." *J.S.B., Jr.*, 2005 SD 3, ¶12, 691 NW2d at 615 (citing *In re* T.H., 396 NW2d 145, 148 (SD 1986)).

### Analysis and Decision

[¶38.] The grandparents first claim that the circuit court erred when it terminated their guardianship over the girls. In South Dakota, a court may terminate a guardianship under SDCL 29A-5-506 after it "determines that the minor is no longer in need of the assistance of protection of a guardian. . . ."[9] In this case, the court considered the father's motion to terminate the guardianship in the

---

9. There is reference in the briefs regarding whether the guardianship was temporary and terminated by operation of law. According to the father, if this were the case, then termination by the court was not necessary. Yet, because the matter was not argued below, we will not address it on appeal. *See* Watertown Coop. Elevator Ass'n v. S.D. Dept. of Rev., 2001 SD 56, ¶11 n5, 627 NW2d 167, 171-72 n5.

context of a divorce proceeding.[10]  The court treated this custody matter as a dispute between parents and non-parents and concluded that physical custody should be with the mother.[11]

[¶39.]      When a non-parent seeks custody, the threshold question is whether the parent is fit to have custody of the child.  *Matter of* Guardianship of Sedelmeier, 491 NW2d 86, 87 (SD 1992).  "The parents' right to custody over their own children should never be disturbed except upon a clear showing against the parent of 'gross misconduct or unfitness, or of other extraordinary circumstances affecting the welfare of the child.'"  *Matter of* Guardianship of T.L.R., 2002 SD 54, ¶13, 645 NW2d 246, 250 (quoting *Sedelmeier,* 491 NW2d at 88).  In this case, the court awarded sole physical custody of the children to the mother.  Therefore, the grandparents had the burden of proving that the mother was unfit, that she committed gross misconduct, or that other extraordinary circumstances affected the welfare of these children such that parental custody should be denied.  *See Sedelmeier,* 491 NW2d at 87-88.

---

10.    For the father's motion, the circuit court required that he plead and prove that there had been a substantial or material change in circumstances affecting the welfare and best interests of the children.  *See* Berens v. Berens, 2004 SD 121, ¶12, 689 NW2d 207, 212; Price v. Price, 2000 SD 64, ¶52, 611 NW2d 425, 436; SDCL 25-4-45.  Accordingly, the court found that "any continued custody of the children by the grandparents would be detrimental to the children's welfare."

11.    The grandparents had been joined as interested parties in the divorce action, which originated in Turner County.  Venue for the divorce action was changed from Turner County to Lincoln County in January 2003 per Judge Gienapp's order.

[¶40.]     With respect to fitness of the biological parents, the circuit court held that the mother and father

> have stable home environments and have the capacity to provide the children with their basic need and have the ability to give their children love, affection, guidance, education, and have the willingness to maturely encourage and provide meaningful contact with the other parent and prepare the children for meaningful adulthood.

*See* Fuerstenberg v. Fuerstenberg, 1999 SD 35, ¶24, 591 NW2d 798, 807. The grandparents do not dispute the mother or father's capacity to provide the children with their basic needs. Rather, the greater part of the grandparents' allegations on appeal are against the father.[12] They contend that extraordinary circumstances exist in this case because it is "never in the best interests of a child to be returned to an abusive situation."

[¶41.]     We recognize that the grandparents have articulated considerable fears about the father and his relationship with his twin daughters, their grandchildren. They have cared for and nurtured these children since the time they were born. Their concern for them is expressed throughout the voluminous record and in their brief to this Court, where they insist that the father sexually abused the children in 2001. However, the circuit judge who presided over the case for two years thoroughly examined the record and made a specific factual finding that it was more probable than not that the sexual abuse *did not occur*.

---

12.     The grandparents also assert that the parents abandoned their children under SDCL 25-7-17. However, they did not argue this in circuit court, and "[w]e refrain from addressing matters brought for the first time on appeal." *See Watertown Coop. Elevator Ass'n*, 2001 SD 56, ¶11 n5, 627 NW2d at 171-72 n5.

[¶42.]     The grandparents ask us to engage in our own assessment of the facts. Yet our standard of review requires us to give deference to the circuit court. *Meldrum*, 2002 SD 15, ¶18, 640 NW2d at 463 (quoting *Langerman*, 336 NW2d at 670). In order for the circuit court's findings to be disturbed, we must have a *definite* and *firm* conviction that a mistake has been made. *J.S.B., Jr.*, 2005 SD 3, ¶12, 691 NW2d at 615 (citing *T.H.*, 396 NW2d at 148). From our review of the record, not only the guardianship termination hearing in May 2004, but the entire settled record submitted for purposes of this appeal, we cannot say that we are left with such a conviction.

[¶43.]     First, the court awarded the mother, not the father, sole physical custody of the children. This is important because the grandparents make no showing that the mother is unfit. Rather, the record supports the court's finding of fitness. Before the guardianship was terminated, the children had lived with their mother for approximately two months as part of a temporary custody arrangement. When the court held the final hearing, it was able to compare the children's current behavior to their past behavior during the time they lived with the grandparents. Based on all the evidence, including expert testimony, the court specifically found that since the transfer of custody to the mother the children have been doing remarkably better. Their anxiety levels had decreased and they were doing well in school.

[¶44.]     Second, even though the brunt of the grandparents' argument is against the father and concerning the alleged abuse, at no time were criminal charges brought against him. He has consistently denied that it happened and has

relentlessly fought to maintain a parental relationship with his daughters. In response, the grandparents insist that it is necessary to take into account the fact that the father failed his polygraph examinations. The grandparents place significant emphasis on this, yet we have repeatedly held that the results from a polygraph examination are not admissible in South Dakota civil or criminal proceedings. Sabag v. Continental South Dakota, 374 NW2d 349, 352 (SD 1985) (citing State v. Muetze, 368 NW2d 575, 588 (SD 1985); State v. Watson, 248 NW2d 398, 399 (SD 1976); State v. O'Connor, 86 SD 294, 301, 194 NW2d 246, 250-51 (1972)). This is because the examinations have "no 'general scientific acceptance as a reliable and accurate means of ascertaining truth or deception.'" *See id.* at 353 (citation omitted).

[¶45.] The circuit court acknowledged the inherent unreliability of polygraph examinations, but it nevertheless reviewed the examination conducted by the Minnesota authorities. The court identified several factors that discredited the results. First, the sole purpose of the examination was to extract a confession from the father. Second, the court found particularly significant that the father's answer to the question on whether he intended to answer truthfully with respect to the questions regarding the alleged sexual abuse was found to be non-deceptive. Third, the court scrutinized the questions that resulted in deceptive responses from the father, discussing the fact that they were general and non-specific questions. Therefore, and in consideration of the lack of scientific reliability for the polygraph examinations, the circuit court concluded that the results of the father's polygraph examination were unpersuasive.

[¶46.] Based on the court's review of videotapes from the scheduled visitations and its consideration of the therapists' observations, the court found compelling the fact that the relationship and interactions between the children and the father were appropriate. The girls were not acting as if they were fearful of him. Indeed, the court, through the same video review, found that the children were enjoying themselves when interacting with their father.

[¶47.] Third, these children are now eleven and have consistently been in counseling since the time of the alleged abuse. Their counselors have been reinforcing with them what is appropriate behavior and what is not. While the grandparents' concerns about the alleged sexual abuse should not be taken lightly, these children have been informed and educated on how to protect themselves. It is also relevant to note that the court gave great weight to the effect of the grandparents' actions on the children's well being. Specifically, the court regarded the grandparents' behavior to be the direct cause of the children's emotional and behavioral problems. It concluded that continued custody with the grandparents would only be detrimental. Therefore, the court held that "[b]ased on the totality of the circumstances, the custodial and guardianship rights of the grandparents should be terminated and such termination would be in the best interests of the children." We cannot say that the circuit court was clearly erroneous.

[¶48.] The grandparents next assert that the court erred when it set forth stringent requirements before they, the grandparents, could see their grandchildren. On the recommendation of the children's therapist and their attorney, the court ordered that before the grandparents can visit the children: (1)

the mother must consent, (2) advance notice must be given to the father and his attorney, (3) Erin Olson, the current counselor, must recommend the visit, and (4) the visit must be specifically authorized by a written order of the court. The effect of these restrictions is to limit substantially the grandparents' visitation. According to the grandparents, this is extreme considering that they have raised and cared for the girls since birth.

[¶49.]     South Dakota recognizes the importance of relationships between grandparents and grandchildren. *See* SDCL 25-4-52. However, grandparent visitation can only occur when it is in the best interests of the grandchild, and when it will not significantly interfere with the parent-child relationship. *See id.* In this case, the court considered the influence and actions of the grandparents to be detrimental to the welfare of the children. This conclusion is supported in the record. The restrictions were clearly established to protect the emotional and mental well being of the children. Moreover, both the mother and father are not opposed to the children having a relationship with their grandparents. But before this can happen, both parents believe that the grandparents must adjust their own negative behaviors.

[¶50.]     Both the father and the grandparents seek appellate attorney's fees and have submitted verified, itemized statements of costs incurred and legal services rendered for purposes of this appeal. In the interests of justice, we award no fees to either side.

[¶51.]     Affirmed.

[¶52.]     GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.