**In the Matter of The GUARDIANSHIP OF Margaret F. RICH.**

Nos. 18180, 18338.

Supreme Court of South Dakota.

Argued Nov. 30, 1993.

Decided July 27, 1994.

Ramon A. Roubideaux, Rapid City, for appellant, Robert M. Wakefield, Sr.

Richard A. Pluimer of Carr and Pluimer, Belle Fourche, for appellee Pioneer Bank & Trust of Belle Fourche.

MILLER, Chief Justice.

Robert M. Wakefield appeals from a circuit court order that Pioneer Bank & Trust be appointed conservator of the estate of his Mother, Margaret F. Rich. He also appeals a subsequent order that all funds from joint bank accounts be delivered to the conservator. We affirm.

### FACTS

Margaret F. Rich (Mother) is an eighty-five-year-old widow from Newell, South Dakota, who at the time of the guardianship hearing resided in a group home in Spearfish, South Dakota. She owns real estate and personal property valued at over $997,-000. Mother has one natural child, a son from her first marriage, Robert M. Wakefield (Son). Son moved to Newell approximately three years ago after residing out of state for a number of years.

On August 25, 1992, Marietta Kimble (Kimble), Mother's long-time friend and neighbor, petitioned the court to appoint a guardian of the person and a guardian of the estate (hereinafter conservator) for Mother on the ground that Mother was no longer able to adequately care for herself or her property.[1] Kimble asked that Pioneer Bank & Trust (Bank) be appointed conservator.

Son filed an objection to the appointment of Bank as conservator and argued that, as her only natural child and sole heir, he was entitled to management of Mother's assets. In support of his position he entered into evidence a copy of her current will, naming him as a beneficiary of a trust to be created under the will, and documents confirming the

---

1. South Dakota has extensively revised its statutes on guardianship proceedings. The new laws did not take effect until July 1, 1993, and are not controlling in this case. However, to be consistent with the language of SDCL 30–36–31, we will refer to a guardian of the estate as a conservator.

existence of joint tenancy bank accounts in the name of Margaret F. Rich or Robert M. Wakefield.

A hearing was held on September 10, 1992. The parties stipulated that Mother was not competent to manage her own affairs. After hearing argument from counsel, the court found that Mother's will "indicates a guarded attitude" toward giving Son financial control of her assets. It also determined that because of the joint tenancy bank accounts, there was a potential conflict of interest in appointing Son as conservator because "a dollar saved in the care of Mother would be a dollar earned in the long term for Mr. Wakefield." The court then appointed Bank as conservator and named Son as guardian of the person.

On Son's motion for rehearing, an evidentiary hearing was held on October 16, 1992. Kimble testified that Mother had discussed the guardianship petition with her and had indicated that she did not trust her family to manage her finances. Kimble reported Mother said that if the family got control of her finances they "would all be driving new cars." Kimble also stated she had been ordered out of the group home where Mother had been placed and no longer felt she could visit her good friend. Son had instructed the home not to allow Mother's friends to visit.

Son testified that he had "considerable" income of his own and was "getting by nicely." He also stated that Mother had recently announced "she wanted to buy me a new car." After first denying it, Son admitted he had borrowed $5,000 from Mother when his family moved back to Newell in 1988. He also confirmed that Mother had purchased a house for one of his daughters, Roberta, to live in and that Roberta paid rent on the home. Son stated that if he was appointed conservator, he would change a joint tenancy account with his Mother from "or to for." He then admitted that of the $103,000 in one joint account, his contribution was only $20.

After first denying that he had discouraged Mother's long-time friends from visiting her, he admitted that he had given written instructions to the group home in which she was living that no one was to see her without his written permission.

Mother testified at the hearing and stated she wanted her Son, not Bank, to watch over her assets.

The trial court affirmed its prior decision that Bank would be conservator and entered findings of fact and conclusions of law. Subsequently, the court allowed Son to propose additional findings of fact and conclusions of law. It entered a final order with findings of fact and conclusions of law on December 3, 1992. The court expressly required that Bank segregate and maintain any joint assets held by Mother.

Before the December order was filed, Son withdrew the $103,000 from a Newell bank and deposited it into an account in the name of two of his children, Roberta and Jeff (hereinafter Grandson). Subsequently, it was learned that Grandson had made an unsuccessful attempt to withdraw $19,900 from another joint account in the names of Margaret F. Rich or Jeff Wakefield at First Western Bank in Belle Fourche. During this time, Son also filed a deed giving him an interest in a parcel of property owned by Mother.

A hearing on an order to show cause and a request for a temporary restraining order was held on December 8, 1992. The court ordered all funds withdrawn from Mother's accounts were to be paid to the clerk of courts pending final disposition. It also found that Son was withholding from the conservator substantial amounts of Mother's property, including keys to safe deposit boxes, savings bonds and certificates of deposit; it ordered all property to be turned over to the conservator for inventory. Son appeals.

I. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN APPOINTING AN INDEPENDENT TRUSTEE BANK AS CONSERVATOR OF THE ESTATE.

Subject to statutory restrictions, the selection of a conservator is a matter which is left primarily to the discretion of the

appointing court.[2] *In re Guardianship of Jacobsen*, 482 N.W.2d 634, 636 (S.D.1992) (citing 30 Am.Jur.2d *Guardian and Ward*, §§ 27, 29 (1968)). Therefore, this Court's standard of review is whether the trial court abused its discretion in appointing a conservator. Only a clear abuse of discretion warrants reversal. *Rykhus v. Rykhus*, 319 N.W.2d 167, 170 (S.D.1982). Abuse of discretion refers to an end or purpose not justified by and clearly against reason and the evidence. *Jacobsen*, 482 N.W.2d at 636; *Herndon v. Herndon*, 305 N.W.2d 917, 918 (S.D.1981).

At the time Bank was appointed conservator, there was no South Dakota statute or case law setting forth the factors a trial court should examine in determining who should be appointed as conservator for a protected person. The legislature subsequently enacted SDCL 30–36–32.[3] While the statute is not controlling in this case, we look to it as a guide for the factors the court weighed in making the appointment.

■ The court examined whether Mother had chosen an individual to be her conservator. Mother's will directs that the residue of her estate is to be put into a residuary trust and names Pioneer Bank & Trust as sole trustee. Further, Mother limited disbursements from the trust to $400 per month for Son and, after his death, $100 per month to each grandchild. This is certainly an indication that Mother wanted a neutral, third party to manage her assets. This conflicts with Mother's testimony at trial. Where conflicting evidence is presented, all conflicts in the evidence must be resolved in favor of the trial court's findings. *In re Metz' Estate*, 78 S.D. 212, 214, 100 N.W.2d 393, 394 (1960).

■ The trial court then weighed the family relationships and wishes of Mother's family. Son admitted that Mother had previously relied on Kimble and requested her help with finances. Kimble testified that Mother had said she did not trust her family and did not want them to know about her financial affairs. This was corroborated by Mother's attorney who stated she had long expressed a desire to keep her financial business private. Evidence showed she had created life estates in deeds rather than giving Son the financial control of a fee simple interest in the properties.

The court then examined the commitment of the possible conservators to promoting Mother's welfare. Evidence was presented that Mother had been admitted to a hospital in the summer of 1992 and was released by the physician only after assurances from the Wakefield family that she would be adequately looked after at home. Approximately two weeks later she was readmitted to the hospital, malnourished and dehydrated. Son was out of town during this time but testified that his wife and daughter were supposed to look after his Mother in his absence. This indicates the family may have been unwilling

2.  SDCL 30–27–6, which governs in this case, provides:

   The circuit court, when it appears necessary or convenient, may appoint a guardian of the person and estate, or either, of a minor or of a person who is mentally ill or for any cause mentally or physically incompetent to manage his own property, such person being hereafter in this title referred to as an incompetent. The court, in appointing a guardian, is to be guided by the consideration set forth in §§ 30–27–19 to 30–27–25, inclusive.

3.  SDCL 30–36–32 provides:

   Any individual who has sufficient capacity to form a preference may at any time nominate any individual or entity to act as his guardian or conservator. The nomination may be made in writing, by an oral request to the court, or may be proved by any other competent evidence. The court shall appoint the individual or entity so nominated if the nominee is otherwise eligible to act and would serve in the best interests of the protected person.

   In the absence of an effective nomination by the protected person, the court shall appoint as guardian or conservator the individual or entity that will act in the protected person's best interests. In making that appointment, the court shall consider the proposed guardian's or conservator's geographic location, familial or other relationship with the protected person, ability to carry out the powers and duties of the office, commitment to promoting the protected person's welfare, any potential conflicts of interest, and the recommendations of the spouse, the parents or other interested relatives, whether made by will or otherwise. The court may appoint more than one guardian or conservator and need not appoint the same individual or entity to serve as both guardian and conservator.

or unable to look after Mother's personal well-being.

Finally, the court examined potential conflicts of interest. This is the strongest factor in support of the trial court's appointment of Bank. A large account was held by Mother and Son in joint tenancy, an account into which Son admitted he deposited only $20. He acknowledged he had never withdrawn money from the account before Mother was found to be unable to manage her own affairs. Son at first denied receiving a loan from Mother and then admitted he had borrowed money from her to buy a home when he returned to live in Newell. He repeatedly expressed concern over the cost of a corporate conservator. Although he stated that he had sufficient monthly income and assets of his own, the record shows a federal tax lien against Son in the amount of $46,978.67, plus penalties. There is also a small claims judgment filed against him.

■ Although the general inclination in this area is to appoint family members, and most statutes so provide, the best interests of the protected person is the overriding interest. *See Bogan v. Arkansas First Nat'l Bank of Hot Springs,* 249 Ark. 840, 462 S.W.2d 203, 204 (1971) (holding although statute expresses a preference for spouse, he has no absolute right to the appointment and the statute leaves it to the court to select that person as guardian who would act in the best interests of the incompetent).

Courts generally select someone with family ties or the nominees of such persons when appointing a guardian. However, that requirement is not mandatory and *the court will disregard the application of a family member if their interest and those of the ward would conflict.* 'The best interest of the ward should be the decisive factor in making any choice on his behalf.'

*Schmidt v. Hebeisen,* 347 N.W.2d 62, 64 (Minn.App.1984) (emphasis added) (quoting *In re Estate of Schober,* 303 Minn. 226, 226 N.W.2d 895, 898 (1975)).

■ Where the trial court had the opportunity to observe the witnesses, we will give due regard to its superior position in judging credibility. *Lukens v. Zavadil,* 281 N.W.2d

78, 80 (S.D.1979); *Nicholaus v. Deming,* 81 S.D. 626, 627, 139 N.W.2d 875 (1966). The court found Mother "consistently expressed a desire to keep financial matters away from family relationships." The record shows Son had financial problems, and that Mother's will directed that upon her death her assets would be put in trust where Son's share was limited to $400 a month. After Bank was appointed conservator, Son withdrew the entire $103,000 from a joint account.

In short, all the factors here indicate that in the best interest of Mother, a neutral, third party should be appointed as conservator. There was no abuse of discretion by the trial court in naming Bank.

## II. THE COURT DID NOT ERR IN DENYING JOINT TENANTS ACCESS TO FUNDS HELD IN JOINT TENANCY WITH PROTECTED PERSON.

The trial court ruled only on the present, possessory rights of the joint tenancy accounts of Mother and reserved any ruling as to the joint tenants' survivorship rights in the accounts.

■ A trial court's findings of fact are presumed correct and are not to be set aside unless they are found to be clearly erroneous. *R & S Construction v. BDL Enterprises,* 500 N.W.2d 628, 630 (S.D.1993); *In re Estate of Hobelsberger,* 85 S.D. 282, 289, 181 N.W.2d 455, 458–59 (1970).

■ The question of a joint tenant's right to funds held in joint tenancy with a protected person is a question of first impression in South Dakota. Cases in other jurisdictions are specifically based on statutes which do not exist in South Dakota. Further, many states follow the rule that joint tenancy bank accounts are akin to joint real property and apply the four unities theory. *See Stout v. Sutphen,* 132 N.J.Eq. 583, 29 A.2d 724 (1943); *Steinmetz v. Steinmetz,* 130 N.J.Eq. 176, 21 A.2d 743 (1941) (holding withdrawal of all funds from joint account severs the four unities and requires a division of the funds under principles of equity). This Court abandoned the four unities approach years ago and adopted the contract of deposit theo-

ry for joint tenancy bank accounts. *Barbour v. First Citizens Nat'l Bank of Watertown,* 77 S.D. 106, 86 N.W.2d 526 (1957), *modified, Wagner v. Wagner,* 83 S.D. 565, 163 N.W.2d 339 (1969).

The general rule is that when one of the depositors is no longer competent and a conservator is appointed, the conservator may withdraw from the account only such funds as are necessary for the needs of the protected person. *Howard v. Imes,* 265 Ala. 298, 90 So.2d 818, 821 (1956); *Boehmer v. Boehmer,* 264 Wis. 15, 58 N.W.2d 411, 413 (1953). However, the few cases determining the rights of other joint tenants during the protected person's lifetime are a muddle. "There is no general rule respecting what, if any, proprietary change takes place with reference to the joint account when one of the depositors becomes incompetent." Annotation, *Effect of incompetency of joint depositor upon status and ownership of bank account,* 62 A.L.R.2d 1090 (1958). "[A] hodgepodge of results, often irreconcilable, has been reached with respect to disputes between the incompetent's estate and the other joint depositor concerning the ownership of the account during the lifetimes of the depositors." *Annotation on effect of incompetency, supra,* § 4.

The only South Dakota case dealing with a related issue is *Johnson–Batchelor v. Hawkins,* 450 N.W.2d 240 (S.D.1990). In *Johnson–Batchelor,* this Court stated that "[i]t is generally accepted that a party to a joint bank account may only withdraw funds without liability to his co-depositor when in fact he is the real owner of the money." *Id.* at 241. In *Johnson–Batchelor,* Father purchased certificates of deposit in joint tenancy with his daughter from a former marriage with funds from a joint tenancy account with his second wife. *Id.* The trial court examined the contributions of husband and second wife to the bank account and determined each had made equal contributions to the account. *Id.* at 242. This Court then affirmed that second wife was entitled to the certificates of deposit insofar as they had been purchased with her half-interest in the joint tenancy account. *Johnson–Batchelor* establishes that the individual contributions of joint depositors is a factor to be weighed in determining the interests of each joint tenant.

The Georgia case of *Dowdy v. Jordan,* 128 Ga.App. 200, 196 S.E.2d 160 (1973) is instructive. In *Dowdy,* the joint tenant had been appointed guardian of the ward's estate. *Id.* at 161. The court determined that the primary reason for establishing the joint account was so the guardian would have access to funds needed to care for the ward. Instead of paying necessary expenses for the ward from the joint account, the guardian utilized other funds, in effect, saving the joint tenancy assets for himself. The court ruled the guardian/joint tenant was required to reimburse the estate to the extent he had spent the ward's other assets for her care.

In this case, there has been no determination of the purposes for which the joint accounts were established. However, the withdrawal by Son and attempted withdrawal by Grandson of the funds in the joint accounts would require that other monies be used for the care of Mother, monies that may have gone into the residuary trust to be established upon her death. This is evidence the family is attempting to spend down the assets that will go into trust to save joint tenancy assets for themselves. Further, the federal tax lien and small claims judgment are evidence that Son is in current need of funds. It also impacts the credibility of his testimony that financially he was "getting by nicely." The trial court's findings of fact are not clearly erroneous. Considering all the evidence, the court did not err in denying Son and family present access to the joint tenancy accounts.[4]

## III. ATTORNEY FEES ON APPEAL.

Mother's conservator requested appellate attorney fees in the amount of $4,926.56. An itemized statement of costs and services performed was provided. *See Malcolm v. Malcolm,* 365 N.W.2d 863, 866 (S.D.1985).

---

4. We have examined Son's claim that Bank has a conflict of interest because it will make a profit on monies it holds as conservator for Mother. Considering SDCL 55–4–11 allows a corporate trustee to deposit with itself funds it holds in trust, we find his claim has no merit.

Attorney fees may only be awarded when authorized by statute or agreement of the parties. *Meisel v. Piggly Wiggly Corp.*, 418 N.W.2d 321, 325 (S.D.1988); *Lowe v. Steele Const. Co.*, 368 N.W.2d 610, 614 (S.D.1985). Award of attorney fees in a guardianship proceeding is now authorized under SDCL 15–17–38, which became law on July 1, 1992.[5]

This Court has previously determined that attorney fees incurred by a petitioner in a guardianship proceeding could be awarded from the estate pursuant to SDCL 30–26–3 "through an application of SDCL 30–25–6." *Jacobsen*, 482 N.W.2d at 641. We have never determined whether attorney fees incurred by a conservator could be awarded to the estate against a party. However, the language of SDCL 15–17–33 clearly provides the authority to impose such fees; "[t]he court may award attorneys' fees ... in probate and guardianship proceedings." This is consistent with cases from other jurisdictions allowing award of attorney fees in probate and guardianship actions. *Alexander v. First Nat'l Bank of Fort Smith*, 278 Ark. 406, 646 S.W.2d 684 (1983) (affirming award imposing attorney fees on former executor but reversing as to beneficiary due to lack of statutory authority); *Estate of McArthur* 443 So.2d 1052 (Fla.App.1984) (affirming award of attorney fees against individual beneficiary of estate); *In re Guardianship of Heinz*, 160 Ill.App.3d 233, 112 Ill.Dec. 163, 513 N.E.2d 577 (1987) (estate may recover attorney fees from former guardian for mismanagement or other causes); *In re Guardianship of Hallauer*, 44 Wash.App. 795, 723 P.2d 1161, 1164–65 (1986) (court may award attorney fees against former guardian "to make the guardianship whole").

However, the statute sets forth no specific test for a court to employ in awarding such fees.[6] In *Jacobsen*, we adopted from probate cases a two-prong test for award of fees incurred by a beneficiary:

1) First, the services rendered must be beneficial to the estate; and

2) Second, the services must have been necessary because of negligence, fraud or failure to defend an interest of the estate by the personal representative of the estate.

*Jacobsen*, 482 N.W.2d at 638 (citing *In re Estate of Hafferman*, 442 N.W.2d 238, 241 (S.D.1989)); *see also In re Estate of Bamberger*, 79 S.D. 85, 108 N.W.2d 50 (1961); *In re Engebretson's Estate*, 68 S.D. 255, 1 N.W.2d 351 (1941).

Previous guardianship statutes and the above cases persuade us that in guardianship proceedings, two factors should be considered to determine whether to award attorney fees against a party:

1) Whether the services rendered benefitted the estate; and

2) Whether the services were necessary because of laches, fraud, failure to defend an interest of the estate, bad faith, mismanagement or other similar action by the party.

In the present case, the trial court found "Robert M. Wakefield, Sr. withdrew $103,000 from the Newell First Savings Bank account and transferred that amount to a separate account in the First Savings Bank in Newell in the names of Roberta (Wakefield) White and Jeff Wakefield, children of Robert M. Wakefield, Sr." The court found that "Jeff Wakefield attempted to withdraw all but

---

5. SDCL 15–17–38 provides:
   The compensation of attorneys and counselors at law for services rendered in civil and criminal actions and special proceedings is left to the agreement, express or implied, of the parties. However, attorneys' fees may be taxed as disbursements if allowed by specific statute. The court, if appropriate, in the interests of justice, may award payment of attorneys' fees in all cases of divorce, annulment of marriage, determination of paternity, separate maintenance, support or alimony. The court may award the fees before or after judgment or order. *The court may award attorneys' fees* from trusts administered through the court as well as *in probate and*

*guardianship proceedings.* Attorneys' fees may be taxed as disbursements on mortgage foreclosures either by action or by advertisement. (Emphasis added.)

6. We note that under prior law, SDCL 15–17–7 allowed attorney fees as costs where provided by statute and SDCL 15–17–33 allowed the court to impose attorney fees where "the court shall direct the same to be paid by the plaintiff or defendant personally for mismanagement or bad faith." Although both statutes were repealed in the revision of guardianship laws, they provide a guide in fashioning a new test.

$100.00 from the First Western Bank, but was unsuccessful in doing so." It further determined that "there is property in the possession of Robert M. Wakefield, Sr. of items such as savings bonds, keys, and other evidence of assets and liabilities which have not been made known to, provided to, or otherwise accounted to Pioneer Bank & Trust and that it is necessary for Pioneer Bank & Trust to have possession of such properties to fulfill its legal duty to inventory and account for the assets of Margaret F. Rich."

It is clear that Son and his family attempted to deplete assets held in joint tenancy and cache them in accounts wherein Mother had no interest. Further, they hindered the conservator from making an accurate inventory of Mother's assets. In an attempt to preserve Mother's assets from depletion by Son, the conservator expended necessary appellate attorney fees. Therefore, we award the estate $4,913.10 from Son.

WUEST, HENDERSON, SABERS and AMUNDSON, JJ., concur.