#30384-aff in pt & rev in pt-JMK
**2025 S.D. 21**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

IN THE MATTER OF THE GUARDIANSHIP AND
CONSERVATORSHIP OF GERDA FLYTE, a/k/a Gerda Mueller,
A PROTECTED PERSON

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
FALL RIVER COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JEFFREY R. CONNOLLY
Judge

\* \* \* \*

JOHN M. FITZGERALD
Rapid City, South Dakota                    Attorney for appellant Charlene
                                            Monfore.


WILLIAM R. HUSTEAD of
Hustead Law Office, P.C.
Hot Springs, South Dakota                   Attorneys for appellee Roger
                                            Flyte.


ELLIOT J. BLOOM of
Beardsley Jensen & Lee, Prof. LLC
Rapid City, South Dakota                    Attorneys for appellee Gerda
                                            Flyte.

\* \* \* \*

CONSIDERED ON BRIEFS
SEPTEMBER 30, 2024
OPINION FILED **03/26/25**

* * * *

N. DREW SKJOLDAL of
Nies Karras & Skjoldal, P.C.
Spearfish, South Dakota

Attorneys for appellee Black
Hills Advocates.

#30384

KERN, Justice

[¶1.] Charlene Monfore petitioned for guardianship and conservatorship over her mother, Gerda Flyte, who suffers from dementia. Roger Flyte, Gerda's son and Charlene's brother, objected to Charlene's appointment and requested that the court appoint him to serve in this capacity. After an evidentiary hearing, the circuit court found that it was not in Gerda's best interests to appoint either Charlene or Roger as guardian or conservator and instead, sua sponte, appointed Black Hills Advocate, LLC (BHA), a for-profit corporation. Charlene appeals, arguing that the circuit court abused its discretion by failing to appoint her to serve as guardian and conservator for Gerda and that the court lacked statutory authority under SDCL 29A-5-110 to appoint a for-profit organization to serve in this capacity.[1] Although Roger's petition for appointment was also denied by the circuit court, he now urges this Court to affirm the appointment of BHA instead of Charlene. In addition, Roger requests appellate attorney fees. We reverse the appointment of BHA concluding that the text of SDCL 29A-5-110 prohibits for-profit corporations from serving as guardians or conservators with the exception of qualified banks or trust companies who may serve as conservators. We remand for further proceedings consistent with this opinion.

**Factual and Procedural Background**

[¶2.] Gerda Flyte is a 90-year-old woman living on her ranch in Oral, South Dakota. She owns agricultural land worth two to three million dollars and leases it to nearby ranchers that run a cow-calf operation. She is affected by worsening

---

1. BHA, while not part of the proceedings below, appears herein as an appellee.

-1-

dementia and other health conditions that impact her daily life. Gerda and her ex-husband Charlie Flyte had two children together—Charlene Monfore and Roger Flyte.

[¶3.] On August 17, 2022, Charlene filed a petition seeking appointment as Gerda's sole temporary, and permanent, guardian and conservator. Accompanying the petition, Charlene submitted a letter from Certified Nurse Practitioner (CNP) Sarah Schryvers, Gerda's primary care provider, informing the court that in her opinion Gerda—on account of her dementia and heart problems—was unable to live independently or manage her financial or medical affairs without assistance. CNP Schryvers recommended that Charlene be appointed as Gerda's legal guardian. The court appointed Charlene as temporary guardian and conservator on August 18, 2022, and scheduled a further hearing to determine whether the appointment should become permanent.

[¶4.] Roger filed an objection and supporting affidavit on February 14, 2023, challenging Charlene's appointment and raising significant concerns about Gerda's physical, emotional, and financial well-being while in Charlene's care. Roger also alleged that the presence of Charlene's son, Matthew, on the ranch had negatively impacted Gerda's safety and well-being. Roger asserted, in part, that Matthew's influence over and manipulation of Charlene led to deficient medical care for Gerda, mismanagement of her finances, disruption of previously functional family relationships, physical altercations, law enforcement involvement, civil proceedings, and use of the ranch for religious services without Gerda's permission. Roger requested an evidentiary hearing and nominated himself as Gerda's permanent

guardian and conservator. Additionally, Roger requested, pursuant to SDCL 29A-5-309, that the court appoint an attorney to represent Gerda's interests. On February 16, 2023, the circuit court appointed Elliot Bloom as counsel for Gerda. Charlene's role as temporary guardian and conservator continued—with extensions—until March 17, 2023, when the circuit court held a two-day evidentiary hearing to determine who should serve as Gerda's permanent guardian and conservator.[2]

[¶5.] The court heard testimony from seven witnesses—Charlene, Roger, Matthew Monfore, Jesse Monfore, Dr. Brian Richman, Dr. Sally Clark, and Sheriff Lyle Norton. Charlene, Roger, and Gerda's counsel agreed at the start of the hearing that Gerda needed a guardian and conservator, and the only remaining issue was who should be appointed to serve on Gerda's behalf.

[¶6.] Charlene, age 64, testified that she was formerly married to Jay Monfore and had two sons, Matthew and Jesse. Charlene, who lived in the area, is a former nurse and has taken care of Gerda on and off since 1996 when Gerda had a stroke that affected her short-term memory. Gerda temporarily lived in Hot Springs following the stroke so Charlene could more easily check on her. A year or two later, Gerda moved back to her ranch. Charlene testified that Gerda did well living independently for approximately ten years after returning to the ranch. In 2010, Charlene noticed Gerda needed more assistance and in 2016, Charlene retired from nursing and moved to the ranch to care for Gerda full-time. Charlene explained that Gerda's dementia had worsened, and she began implementing

---

2. The hearing was held on March 17 and March 30, 2023. Gerda's presence at the hearing was waived by her counsel.

systems to help Gerda remember to do daily tasks such as taking her medication. In the spring of 2018, Charlene's younger son, Matthew, age 28, moved to the ranch to help Charlene care for Gerda. Matthew lives in Gerda's 3-bedroom, 1,700 square foot ranch house with Gerda and Charlene and does not pay rent. Matthew attended the Cornerstone Bible Institute in Fall River County and identifies himself as a minister.

[¶7.] In the fall of 2019, Matthew brought his father—Charlene's ex-husband Jay—to the ranch to care for him while Charlene was away on a trip. Jay has Parkinson's disease for which he requires significant care and assistance. Charlene testified that Jay had an apartment in Hot Springs but moved into the ranch house full-time in 2020. Jay also does not pay rent to Gerda.

[¶8.] As noted above, Roger raised concerns in his affidavit and during the evidentiary hearing about Gerda's medical care and treatment during the years that she was in Charlene's care. Dr. Sally Clark, Gerda's dentist from 2012 until May 2022, testified via Zoom that in 2015, Gerda had "numerous broken teeth and teeth that had big cavities," and Dr. Clark was worried they would break off in her mouth. Because of her dental condition, Gerda could only eat food brought to room temperature. Accordingly, Dr. Clark informed Charlene that Gerda would need to have several of her teeth extracted. However, Dr. Clark explained that Gerda had "a lot going on medically at that time" and Gerda had to be in stable condition when the teeth were removed. After discussing the risk that the teeth could become infected before removal, Dr. Clark instructed Charlene to watch for signs of infection. Charlene told Dr. Clark that they would wait to have the teeth pulled

and monitor Gerda in the interim, which Dr. Clark agreed was a reasonable approach under the circumstances.

[¶9.] Dr. Clark testified that her notes indicated that Gerda did not come back to her office until May 2022, almost seven years after the 2015 visit. In May 2022, someone visiting the ranch noticed that Gerda's jaw was red. Roger looked in Gerda's mouth and saw that it was seriously infected. Charlene sent pictures of Gerda's mouth to Dr. Clark's office, and Dr. Clark asked to see Gerda immediately. Dr. Clark referred Gerda to Dr. Brian Richman, an oral surgeon, and all of her remaining teeth were removed on June 27, 2022.

[¶10.] Gerda also had a history of falling, which led Roger and Charlene to prioritize removing rugs and other trip hazards from the ranch house. In the fall of 2020, Gerda fell in the living room "on a Wednesday." Charlene called Roger, who was living in Arizona, and told him about the fall. Charlene testified that Gerda had fallen before and that she would generally "give her a few minutes to be able to pick herself back up" before rendering aid. When Gerda could not get up on her own, Charlene asked Matthew to help pick her up, and together they placed Gerda in a recliner. Charlene said that Gerda complained of pain in her right hip when bearing weight on it but had no pain when she sat in the chair. Charlene testified that during her call to Roger that same day, she asked him to come to South Dakota. Roger testified that he told Charlene to call an ambulance, but Charlene said that they would wait and see how Gerda progressed. Roger explained that when he talked to Charlene the next day, Gerda still could not put weight on her

right leg. Roger informed Charlene Thursday night or Friday morning that he was going to fly to South Dakota to take Gerda to the hospital.

[¶11.] Roger landed in South Dakota late on Friday night and testified that when he arrived at the ranch, Gerda was sleeping and he "[d]idn't feel the need to disturb her in her sleep." They called an ambulance the following morning, and Gerda was transported to the hospital in Rapid City. After examination, the doctors concluded that Gerda had broken her hip in three places during the fall and she needed hip replacement surgery. Roger stayed at the ranch for three weeks, caring for Gerda, sleeping near her bed, and helping her recover.

[¶12.] Roger also testified about his concerns that Gerda was not receiving necessary medications because Charlene and Matthew did not believe in conventional medicine. Gerda had a history of mini-strokes and took several prescription medicines including Warfarin, a blood thinner. Charlene testified that she and Matthew, based on advice of doctors Matthew found online, decided to take Gerda off her prescription medications and put her on supplements instead. However, none of the online doctors ever met or examined Gerda, nor did they have access to her medical records. Charlene admitted that she took Gerda off her medications but denied an accusation that she did not believe in antibiotics. She testified that in fact she had administered all of Gerda's antibiotics to combat her dental infection.

[¶13.] Roger also challenged Charlene's ability to manage Gerda's financial affairs. In 1996, Gerda executed a power of attorney appointing Charlene and Roger as co-attorneys-in-fact granting them both authority over her medical and

financial affairs. Roger testified that he "never really did much with it" and that Charlene primarily managed Gerda's finances because she was in South Dakota while Roger lived in Arizona. In April 2018, Charlene asked Roger if they could close Gerda's "one remaining IRA" at Wells Fargo bank. During a trip to Arizona, Charlene and Roger went to Wells Fargo, but they would not accept the joint power of attorney because they felt "it was antiquated."

[¶14.] When Charlene returned to South Dakota, she took Gerda to Wells Fargo to try to close the account, but Wells Fargo again refused, this time because Gerda did not have a driver's license. Charlene testified that she then printed a power of attorney form that she found online and named herself the sole attorney-in-fact. She stated that she "intended to put Roger back on the POA" but "just sort of let it go" because of Roger's concerning financial status. Charlene testified that she did not inform Roger of the new power of attorney for eight or nine months. Roger stated that he did not know he had been removed as a joint POA until 2021.

[¶15.] Charlene testified that she managed Gerda's finances and that Gerda received approximately $1,500 per month from Social Security and between $12,000 and $14,000 per year in lease payments for her ranch land. The Social Security payments, according to Charlene, were used to pay for many of Gerda's expenses including for the electricity for the wells that water the cattle and the property insurance. Charlene is the named insured on insurance policies for the ranch and Gerda's vehicle. Charlene explained that Gerda, despite not being the named insured, pays Charlene for the portion of the insurance premiums attributable to the ranch and Gerda's vehicle.

[¶16.]     In support of his request to be appointed as Gerda's guardian and conservator, Roger provided the court with his history and background. Roger testified that he was previously married and raised a family in Arizona where he lived for thirty-seven years, operating a hospitality business. He cared for his and Charlene's father, Charlie, from 2011 until he passed away in 2019. Roger's business began to suffer during the COVID-19 pandemic and ultimately closed. Around that time, Roger was also divorced from his wife. Roger visited South Dakota in January 2022 and asked Gerda and Charlene if he could move to the ranch. Roger testified that Gerda was excited about the prospect of his return, and Charlene stated that she could use help caring for Gerda. Roger stated that Charlene said he would need to "stay busy; you know, get a job; be employed" if he was going to be at the ranch. Roger explained that his lease in Arizona ended in March 2022, and he moved to the ranch in April. He lived in a park-model mobile home owned by Charlene and her son, Jesse, that was parked near Gerda's house on the ranch.

[¶17.]     Charlene testified about her concerns that Roger was financially irresponsible and had a gambling problem.[3] In response, Roger testified that he was financially "drained" by his business slowing in 2018, and he was required to pay back taxes. He also testified that he has "never been a good financial planner." When his business slowed, he asked Charlene for a 30-day $15,000 loan. Both

---

3.     The court considered conflicting testimony about the nature and extent of Roger's gambling problem. Roger testified that, in his view, his gambling was not an issue because he used his own money. Charlene's son, Jesse, testified that despite Roger's gambling problem, he still supported his nomination as guardian and conservator.

Charlene and Roger agreed that he paid the loan back late, with Roger testifying that he paid it back "close to a year" later.

[¶18.] During the evidentiary hearing, the court also heard testimony about Matthew's role in the family and his activities on and off the ranch. Matthew testified that he operates a church headquartered at the ranch called Jesus is King Mission. Several witnesses testified that Matthew regularly posts religious signs on Gerda's property and hosts church services in Gerda's house, with Charlene's permission. Matthew testified that he used to publicize the services at the ranch but stopped posting the address because of "terrorist threats" that he received because of his evangelization activities. The court heard testimony that Matthew's religious fervor led the Oglala Sioux Tribe to banish him from the Pine Ridge Indian Reservation and to require all future missionaries operating on the reservation to register with the Tribe.

[¶19.] In addition to holding services, Matthew invited numerous individuals associated with the church to stay at the ranch. Matthew testified that some, but not all, of those people paid rent. The proceeds from those who did pay rent were split between the church and Charlene. Both Roger and Jesse testified that Matthew's religious fervor and aggressive demeanor, including constantly recording Roger with his cell phone, had become a point of contention between Matthew, Roger, and Charlene. Jesse testified that he lived in Arizona and used to frequently visit South Dakota, but no longer does so because Matthew makes him feel unsafe. Jesse also testified that Matthew's controlling presence has changed Charlene, including the way she cares for Gerda.

[¶20.]     In contrast to Matthew, Gerda is a confirmed Lutheran and longtime member of Bethesda Lutheran Church in Hot Springs.  Matthew admitted that his religious views differ greatly from Gerda's, and that he and Charlene do not attend Bethesda Lutheran.  Roger and Charlene both testified that Roger used to take Gerda to Bethesda Lutheran, but Charlene no longer allows him to do so.

[¶21.]     Charlene, Roger, and Matthew's contentious relationship led to law enforcement involvement on at least two occasions.  Roger testified that on September 25, 2021, he called the police because Matthew was threatening Gerda and Jay.  The incident began, according to Matthew, when he showed Jay and Gerda a video comparing certain groups to Nazis.  Roger testified that Gerda grew up in Nazi Germany, and this video was traumatic for her to watch.  At the hearing, Roger called Sheriff Lyle Norton to lay foundation for the admission of Exhibit Q, a police report from Deputy Sheriff Isnalawica Belt who responded to this incident, and Exhibit R containing Deputy Belt's body camera footage.

[¶22.]     The report and video show Deputy Belt speaking to each person, after which he determined that Gerda was confused and unable to correctly state the year or current President, but that Jay passed basic cognitive benchmark tests.  Deputy Belt's report also includes Jay's statement that he did not feel safe around Matthew.  At the conclusion of his investigation Deputy Belt determined that he did not have probable cause to arrest Matthew but warned him that if he did not keep his distance from Jay, he would come back and arrest him.

[¶23.]     Roger testified that Charlene summoned law enforcement to the ranch again in May 2022.  He explained that Charlene and Matthew were recording

everything Roger did at the ranch, which led to an argument.[4]  Matthew then made fun of Roger for having previously contemplated suicide, which led to Roger "pushing Matthew against a wall."[5]  Roger was charged with simple assault but eventually pled to a reduced charge of disorderly conduct for which he served a short jail sentence and was ordered to have no contact with Matthew.

[¶24.]  Following this incident, Roger testified that he was "basically excommunicated" from Gerda's house due to the no-contact order.  Because Matthew was living in the house, Roger testified that he could not enter for fear of violating the order, despite living on Gerda's property in the mobile home nearby.  When he wanted to be with Gerda, Roger testified that he would text Charlene that he would like to take Gerda for a drive, an activity that they both previously enjoyed and engaged in often.  However, Charlene eventually stopped allowing Roger to see Gerda without Charlene present.  Roger testified that this requirement for supervised visitation with Gerda was still in place at the time of the evidentiary hearing.

[¶25.]  After the evidentiary portion of the hearing was complete, Gerda's counsel addressed the court and made recommendations on her behalf.  Her counsel requested that the court appoint Charlene as conservator and primary guardian for Gerda, and that Roger be appointed as a limited guardian.  Under this proposed

---

4.  The recorded videos of this incident were admitted as Exhibit 3.

5.  The circuit court, in its memorandum opinion, characterized Roger's actions as pushing Matthew against a wall.  In Exhibit 3, Matthew accused Roger of choking him.  Charlene agreed with that description.  Matthew also recorded and photographed red marks that allegedly appeared on his neck due to the incident.

arrangement, counsel suggested that Roger's role would be limited to ensuring that Gerda attends medical and dental appointments, spends time outside of the house, and attends church at Bethesda Lutheran if she so desires. Gerda's counsel identified multiple concerns with the status quo, including people living rent-free on Gerda's property and Charlene's name being on Gerda's health savings account and the insurance policy for the ranch and house. If this proposed arrangement was ordered by the court, Gerda's counsel urged the court to require that anyone who stayed in the ranch house pay rent to Gerda. Additionally, Gerda's counsel asked the court to continue his appointment on Gerda's behalf for at least one year until the first annual report was filed.

[¶26.] Charlene requested that she be appointed sole guardian and sole conservator or alternatively, that the court adopt Gerda's counsel's proposed arrangement. Charlene argued that she and Roger historically could not agree when they acted as co-attorneys-in-fact and asserted that appointing them in joint roles would lead to more court involvement. Roger requested that he be appointed guardian and conservator or alternatively that he and Charlene be appointed co-guardians and conservators. Roger argued that he and Charlene could work together if Matthew was no longer involved.

[¶27.] The circuit court took the matter under advisement. Roger filed a motion to supplement the record on May 9, 2023, which Charlene supported. Both parties submitted affidavits detailing an incident on May 5, 2023, where Gerda fell and again broke a hip. According to the affidavits, Gerda and Matthew were sitting on the front porch of Gerda's home in the afternoon and Matthew stepped away to

take a phone call. Gerda attempted to walk back inside the house and fell. She was transported to the hospital by ambulance. The circuit court granted the motion to supplement the record and issued a memorandum decision on May 24, 2023. The court declined to appoint either Charlene or Roger, instead appointing BHA. The court acknowledged that although well-intentioned, Gerda's counsel's recommendation for Charlene to serve as primary guardian with Roger acting as a limited guardian did not adequately account for the concerns raised about Charlene's ability to act in Gerda's best interests. The circuit court acknowledged Roger's positive impact on Gerda in the past and noted that it considered appointing Roger as sole guardian and conservator but declined to do so because of his history of financial and anger management problems.

[¶28.] In considering Charlene as guardian and conservator, the circuit court expressed concern about Charlene's failure to communicate information to Roger and her actions limiting Roger's ability to be involved in Gerda's care. The court pointed to Charlene's refusal to take Gerda to the hospital for three days after the first time she fell and broke her hip, instead waiting for Roger to come to South Dakota from Arizona. The court found that because Roger had been a "driving force in obtaining necessary care for Gerda," Charlene's restrictions on Roger's participation showed that Charlene was not acting in Gerda's best interests. Further, the court determined that Charlene's decision to seek a permanent protection order against Roger made it probable that Charlene would refuse to

include Roger in Gerda's care in the future.[6] Due to these concerns, as well as Charlene's financial indiscretions—unilaterally altering the dual power of attorney to exclude Roger, mismanaging Gerda's agricultural leases, holding insurance policies that should be in Gerda's name, and allowing multiple people to stay at Gerda's house without paying rent—the court declined to appoint Charlene as conservator or guardian.

[¶29.] The circuit court also found Matthew's involvement in Gerda's care was a significant factor affecting Charlene's ability to care for Gerda, concluding that only a third-party would be able to protect Gerda from Matthew. The court found that Matthew, who operated a religious entity and website, displayed large signs and banners on Gerda's property and regularly held religious services in her house without her permission. Matthew admitted these services provoked threats against him and others, placing them in physical danger. Matthew also allowed people related to his religious entity to stay on Gerda's property without paying rent. The court noted that Charlene allowed all of this despite knowing that it caused conflicts on Gerda's property, which was especially concerning to the court because Matthew's religious views were contrary to Gerda's. Charlene appeals, raising two issues for our review, which we revise and restate below.[7] Additionally, Roger has requested an award of appellate attorney fees.

---

6. At the time of the evidentiary hearing Charlene had a pending petition for a permanent protection order against Roger. The circuit court had denied her request for a temporary order and set the matter for hearing.

7. Gerda's counsel requested and received permission to file an amicus curiae brief.

1.      Whether the circuit court abused its discretion by denying Charlene's petition for appointment as Gerda's guardian and conservator.

2.      Whether SDCL 29A-5-110 authorizes the appointment of a for-profit entity as a guardian and/or conservator.

**Standard of Review**

[¶30.]      Appointments of guardians and conservators are reviewed for abuse of discretion. *Matter of Guardianship of Rich*, 520 N.W.2d 63, 66 (S.D. 1994). An abuse of discretion "is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Thurman v. CUNA Mut. Ins. Soc'y*, 2013 S.D. 63, ¶ 11, 836 N.W.2d 611, 616 (citation omitted). "The 'circuit court's factual findings are reviewed under the clearly erroneous standard.'" *In re Guardianship of S.M.N.*, 2010 S.D. 31, ¶ 11, 781 N.W.2d 213, 218 (quoting *In re Guardianship and Conservatorship of A.L.T. & S.J.T.*, 2006 S.D. 28, ¶ 37, 712 N.W.2d 338, 347). "Findings of fact are clearly erroneous when a complete review of the evidence leaves this Court with a 'definite and firm conviction that a mistake has been made.'" *Id.* (citation omitted). We review questions of law requiring statutory construction de novo. *Hauck v. Clay Cnty. Comm'n*, 2023 S.D. 43, ¶ 6, 994 N.W.2d 707, 710 (citing *Dale v. Young*, 2015 S.D. 96, ¶ 5, 873 N.W.2d 72, 73).

## Analysis and Decision

### 1. Whether the circuit court abused its discretion by denying Charlene's petition for appointment as Gerda's guardian and conservator.

[¶31.] SDCL 29A-5-304 requires the circuit court to consider a number of factors when appointing guardians and conservators. While we have acknowledged that "the general inclination in this area is to appoint family members, . . . the best interests of the protected person is the overriding interest." *In re Guardianship of Blare*, 1999 S.D. 3, ¶ 24, 589 N.W.2d 211, 216 (citation omitted) (affirming appointment of a third-party guardian when the circuit court found that appointing a family member who had withheld information regarding the care of the protected person would not be in the best interests of the protected person). "Subject to statutory restrictions, the selection of the person to be appointed guardian is a matter which is committed largely to the discretion of the appointing court." *In re Guardianship & Est. of Jacobsen*, 482 N.W.2d 634, 636 (S.D. 1992).

[¶32.] Charlene argues that the circuit court abused its discretion by declining to appoint her as Gerda's guardian and conservator. She criticizes many of the circuit court's findings, offering alternative conclusions and interpretations of the evidence presented during the hearing. The circuit court found that Charlene's care for Gerda revealed many shortcomings in the provision of basic medical care and in the exercise of her fiduciary duties. Regarding medical care, the circuit court found that Charlene "trusted Gerda's medical care to individuals who have never met her instead of relying on her existing local physicians." This, along with Charlene's lack of communication with Roger, led to a failure "to provide Gerda

basic, necessary care on multiple occasions." Notably, Gerda fell twice while in Charlene's care, breaking her hip both times. Additionally, Charlene failed to take Gerda to the dentist for seven years, and when she was eventually seen by the dentist, she was referred for emergency oral surgery to remove all her teeth to combat a serious infection.

[¶33.] Concerning the exercise of her fiduciary duties, the circuit court found that Charlene unilaterally altered her dual power of attorney with Roger "to eliminate Roger's powers." Additionally, the court found that "Charlene has limited Roger's ability to participate in decisions regarding their mother." Charlene is also the beneficiary of certain insurance policies rather than Gerda, has mismanaged Gerda's agricultural land lease, and is allowing her ex-husband and her son to live in Gerda's house rent-free.

[¶34.] Charlene argues that the above facts do not constitute failures in the performance of her duties as temporary guardian or financial indiscretions in her role as conservator. While not disputing that Gerda broke her hip twice and had a severe infection in her mouth requiring all of her teeth to be removed, Charlene asserts that she cared for Gerda "very effectively" for seven years. She disagrees with the circuit court's finding that she refused to take Gerda to the hospital after the first hip fracture until Roger flew from Arizona to South Dakota. She argues that she and Roger agreed to take Gerda to the hospital and that Roger did not have to persuade her to do so.

[¶35.] She also argues that she has assisted Gerda financially by providing care at no cost and making significant and needed improvements to Gerda's home

by remodeling Gerda's kitchen, bathrooms, windows, and railings in order to provide better care for Gerda in her own home. Charlene testified that she initially paid for these projects and did so by making an interest-free loan to Gerda. She asserts that "[t]he result of all these improvements was a well-kept and tidy home."

[¶36.] Charlene also takes issue with the circuit court's discussion of Matthew's conduct because he "was and is not the applicant for Guardian or Conservator." However, the circuit court explained its concerns about Matthew's impact on Charlene's ability to act in Gerda's best interests. The circuit court found that "[n]ot only does Charlene allow her son to exploit his grandmother's property and safety, but she does so while admitting that Matthew's religious beliefs are contrary to Gerda's beliefs." The circuit court was "very concerned that Charlene will continue to encourage his behavior if she is allowed to serve as Gerda's guardian or conservator."

[¶37.] Charlene also argues that the circuit court impermissibly considered Matthew's religion in its decision to appoint BHA as guardian and conservator. However, the circuit court did not base its determination on Matthew's religious views, but on the concrete effects that his presence and religious activities had on Gerda and the use of her property. Matthew's religious services provoked terroristic threats aimed at Gerda's home address. Charlene implies that those threats were insignificant because the quality and nature of the threats were not ascertained. But as Roger notes, the court's obligation was to focus on what was in Gerda's best interests and who could best promote "the protected person's welfare," including her physical safety. SDCL 29A-5-304.

[¶38.]     While Charlene may believe that the facts found by the circuit court regarding Matthew's activities at the ranch do not amount to cause for concern, the court found otherwise.  Under an abuse of discretion standard, "[t]his Court is not free to reweigh the evidence or gauge the credibility of the witnesses." *Miller v. Hernandez*, 520 N.W.2d 266, 272 (S.D. 1994).  "We will not set aside a trial court's findings of fact unless they are clearly erroneous.  A trial court's finding is clearly erroneous if, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been made." *In re Est. of Pringle*, 2008 S.D. 38, ¶ 18, 751 N.W.2d 277, 284.  We "defer to the judge's firsthand perception of the witnesses and the significance the judge gave to their testimony." *Zepeda v. Zepeda*, 2001 S.D. 101, ¶ 19, 632 N.W.2d 48, 55; *See also In re Adoption of I.V.E.*, 2024 S.D. 32, ¶ 32, 9 N.W.3d 260, 268.  Charlene's arguments essentially ask this Court to reweigh the evidence, which we decline to do.

[¶39.]     Based on our review of the record we conclude that there is ample evidence to support the circuit court's findings.  Further, Charlene failed to establish that any of the circuit court's factual findings were clearly erroneous.  We therefore conclude that the circuit court did not abuse its discretion by declining to appoint Charlene as Gerda's guardian and conservator.

### 2.     Whether SDCL 29A-5-110 authorizes the appointment of a for-profit entity as a guardian and/or conservator.

[¶40.]     Charlene challenges the appointment of BHA raising two issues involving statutory interpretation for our review.  First, she contends the circuit court erred by appointing a third-party guardian sua sponte.  Second, she argues

the court erred by appointing BHA because SDCL 29A-5-110 does not authorize appointment of a for-profit entity to serve as guardian or conservator.[8]

[¶41.] "The purpose of statutory interpretation is to discover legislative intent." *Betty Jean Strom Tr. v. SCS Carbon Transport, LLC*, 2024 S.D. 48, ¶ 45, 11 N.W.3d 71, 88 (quoting *State v. Long Soldier*, 2023 S.D. 37, ¶ 11, 994 N.W.2d 212, 217). Statutory interpretation begins with an examination of the plain language of the statute. *Id.* (citation omitted). "In conducting statutory interpretation, we give words their plain meaning and effect, and read statutes as a whole." *Id.* (citation omitted).

[¶42.] The appointment of a guardian and conservator is governed by SDCL 29A-5-110 and SDCL 29A-5-304. When a protected person "has sufficient capacity to form a preference," they "may at any time nominate any individual or entity to act as his guardian or conservator." SDCL 29A-5-304. After such a nomination, if the nominee is "otherwise eligible to act and would serve in the best interests of the protected person[,]" the court must appoint the nominee. *Id.* However, if the protected person does not nominate anyone, "the court shall appoint as guardian or

---

8. As an initial matter, Roger argues that we lack jurisdiction to hear this issue because Charlene failed to properly raise it in her notice of appeal. SDCL 15-26A-4(1) provides that a notice of appeal "shall specify the party or parties taking the appeal; shall designate the judgment, order, or part thereof appealed from[.]" Charlene's notice of appeal broadly states that the appeal is taken from "the Memorandum Opinion dated May 24, 2023." Under, SDCL 15-26A-7, we "may review any order, ruling, or determination of the trial court, including an order denying a new trial, and whether any such order, ruling, or determination is made before or after judgment involving the merits and necessarily affecting the judgment and appearing upon the record." Charlene's notice of appeal complied with these provisions, and we have jurisdiction to review each related claim of error.

conservator the individual or entity that will act in the protected person's best interests." *Id.* When considering who or what entity to appoint, one of the factors to be considered is the existence of potential conflicts of interest. *Id.*

[¶43.] Regardless of whether a nomination was made, SDCL 29A-5-110 describes guardian and conservator eligibility requirements.[9] Any capable *adult*

---

9. SDCL 29A-5-110 provides, in relevant part:

> Any adult individual may be appointed as a guardian, a conservator, or both, if capable of providing an active and suitable program of guardianship or conservatorship for the minor or protected person, and if not employed by any public or private agency, entity, or facility that is providing substantial services or financial assistance to the minor or protected person. The court may waive the prohibition on appointing an individual as guardian or conservator because of the individual's employment if the court finds the appointment is in the best interest of the minor or protected person.

> Any public agency or nonprofit corporation may be appointed as a guardian, a conservator, or both, if it is capable of providing an active and suitable program of guardianship or conservatorship for the minor or protected person, and if it is not providing substantial services or financial assistance to the minor or protected person.

> Any bank or trust company authorized to exercise trust powers or to engage in trust business in this state may be appointed as a conservator if it is capable of providing a suitable program of conservatorship for the minor or protected person.

> The Department of Human Services may be appointed as a guardian, a conservator, or both, for individuals under its care or to whom it is providing services or financial assistance, but such appointment may only be made if there is no individual, nonprofit corporation, bank or trust company, or other public agency that is qualified and willing to serve.

(continued . . .)

*individual* may serve as guardian or conservator, unless they work for an agency, entity, or facility that provides "substantial services or financial assistance" to the protected person. SDCL 29A-5-110. This prohibition may be waived by the court if it finds that the best interests of the protected person would be served best by the individual. *Id.*

[¶44.]     Similarly, for entities, any capable *public agency or nonprofit corporation* is eligible to serve as guardian or conservator as long as it is not providing "substantial services or financial assistance" to the protected person. *Id.* Notably, unlike the provision for appointment of individuals, the court cannot waive the above requirement for entities, even if the court finds that the entity would act in the protected person's best interest. *Id.* The terms of SDCL 29A-5-110 also permit the court to appoint banks or trust companies to serve as conservators. *Id.* If no individual or entity is qualified and willing to serve as guardian or conservator, the South Dakota Department of Human Services may serve as either or both, provided that the Department is already furnishing services or financial assistance to the protected person. *Id.*

[¶45.]     Regarding her claim that the court improperly acted on its own motion by appointing BHA, Charlene points out that some provisions in SDCL chapter 29A-5 detail instances where a circuit court is expressly empowered to act on its

---

(. . . continued)

> No individual or entity, other than a bank or trust company,
> whose only interest is that of a creditor, is eligible for
> appointment as either a guardian or conservator.

own motion,[10] but she asserts that SDCL 29A-5-304 does not contain such explicit authorization. Accordingly, Charlene argues that the lack of an explicit authorization to act on its own motion indicates that the court is prohibited from doing so. As support for this argument, Charlene urges this Court to apply the negative implication canon, or *expressio unius est exclusio alterius*. "[T]he expression of one thing is the exclusion of another." *In re Est. of Flaws*, 2012 S.D. 3, ¶ 19, 811 N.W.2d 749, 753 (citation omitted). Charlene also argues that the statute's use of the word "proposed" requires the selected guardian to be proposed by an interested party.

[¶46.]     Here, it is neither appropriate nor necessary to apply the negative implication canon to this question. When a statute includes a list of potential methods to accomplish an objective, it is implied that any action not listed is excluded. *Id.* ¶ 20, 811 N.W.2d at 754. When there is not a list, the negative implication canon should not be applied. Here, the collection of issues that Charlene urges us to consider together do not appear together as a list, nor are they alternative methods of appointing a conservator or guardian. Instead, they are separate provisions detailing different aspects of the procedure and standards for

---

10.     Charlene identifies seven provisions which she contends explicitly authorize a court to act sua sponte: SDCL 29A-5-312 (closing a trial to appoint guardian and conservator); SDCL 29A-5-403 (ordering a guardian to attend a hearing on an annual report); SDCL 29A-5-408 (ordering a conservator to attend a hearing on an annual accounting); SDCL 29A-5-413 (voiding particular transactions between a conservator and protected person); SDCL 29A-5-504 (removing a guardian or conservator); SDCL 29A-5-506 (terminating a guardianship or conservatorship of a minor); SDCL 29A-5-508 (terminating, modifying, or revoking a guardianship, conservatorship, or limited guardianship).

appointing, monitoring, and terminating a guardianship or conservatorship. Thus, in this context, the negative implication canon cannot be applied.

[¶47.] Turning to the text, SDCL 29A-5-304 clearly contemplates sua sponte appointment by the circuit court. When the protected person does not nominate any person or entity, SDCL 29A-5-304 provides that a circuit court "shall appoint as guardian or conservator the individual or entity that will act in the protected person's best interests." Additionally, even if the protected person effectively nominates an individual or entity to serve as their guardian or conservator, the circuit court must ensure that "the nominee is otherwise eligible to act and would serve in the best interests of the protected person." *Id.* Thus, the text of SDCL 29A-5-304 requires the court to make an appointment based on the best interests of the protected person. Where, as here, the circuit court determines that neither option presented by the parties would serve the protected person's best interest, it is inconsistent with the text of the statute to restrict appointment to those options.[11]

[¶48.] Next, Charlene argues that the circuit court exceeded its statutory authority by appointing a for-profit entity as guardian and conservator. Charlene asserts that SDCL 29A-5-110 explicitly and exhaustively authorizes certain individuals and groups to serve as guardian or conservator while prohibiting any

---

11. Although we conclude that a circuit court may act sua sponte, the better practice for a court considering appointment of a qualified third party, is to allow for input from interested family members or other persons prior to such appointment. By doing so, the circuit court complies with the provision of SDCL 29A-5-304 stating that "the court shall consider . . . the recommendations of the spouse [and] the parents or other interested relatives" when appointing a guardian or conservator absent a nomination by the protected person.

-24-

individual or entity not listed.  Again focusing on the negative implication canon, Charlene argues that the general categories of eligible guardians and conservators outlined in SDCL 29A-5-110—"adult individual," "public agency or nonprofit corporation," "bank or trust company," and the "Department of Human Services"— do not include for-profit entities and, therefore, they must be excluded.

[¶49.]        In response BHA asserts that the negative implication canon should not be applied here, citing Scalia and Garner to support its view that for-profit entities are simply not considered by the statute.  Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 94 (2012).  BHA contends that determining for-profit entities to be outside of the scope of SDCL 29A-5-110 would be judicial overreach, inserting a prohibition where none exists.  Additionally, BHA urges us to apply a "common sense" reading of the statute, arguing that SDCL 29A-5-110 is a "series of somewhat unrelated paragraphs, all serving to give the circuit court guidance" in its effort to appoint a conservator or guardian in the best interests of the protected person.  Finally, BHA argues that the application of Charlene's theory would lead to absurd results.  One such result, BHA contends, is that an individual would be permitted to collect a fee for serving as guardian or conservator, effectively acting as a for-profit individual, but a for-profit entity could not serve in the identical capacity solely because of its for-profit status.

[¶50.]        An examination of the text of SDCL 29A-5-110 reveals that the Legislature provided a set of qualifications for those appointed as guardians and conservators.  A "qualification" is "[t]he possession of qualities or properties (such as fitness or capacity) inherently or legally necessary to make one eligible for a

position or office, or to perform a public duty or function[.]" *Qualification*, Black's Law Dictionary (12th ed. 2024). A "qualification" is not equivalent to a "consideration."

[¶51.] The Legislature enumerated specific considerations for the appointment of guardians and conservators in SDCL 29A-5-304, providing that when there is no nomination, "the court shall appoint as guardian or conservator the individual or entity that will act in the protected person's best interests." In so doing, "*the court shall consider* the proposed guardian's or conservator's geographic location, familial or other relationship with the protected person, ability to carry out the powers and duties of the office, commitment to promoting the protected person's welfare, any potential conflicts of interest, and the recommendations of the [protected person's family]." (Emphasis added.) SDCL 29A-5-110, however, serves a different purpose. It establishes the base qualifications for an individual or entity to serve as a guardian or conservator. Unless a proposed guardian or conservator meets those qualifications, or there is a showing of good cause to permit an exception, a court lacks statutory authority to make the appointment.

[¶52.] Here, the Legislature unambiguously evinced its intent to exclude for-profit entities as qualified guardians and conservators. It is, therefore, unnecessary to consider the cannons of construction promoted by the parties. *Salzer v. Barff*, 2010 S.D. 96, ¶ 5, 792 N.W.2d 177, 179 ("We have no cause to invoke the canons of construction where the language of a statute is clear."). Had the Legislature wished to allow for-profit entities to be appointed as guardian or conservator, it could have omitted "non-profit" from the statute, altering the statutory language to read "any

public agency or corporation may be appointed . . . ." But the Legislature chose to include "non-profit" in SDCL 29A-5-110, and we decline to read it out of the statute.

[¶53.]     This interpretation is bolstered by the explicit consideration that the Legislature gave to conflicts of interest and the protection of vulnerable individuals from abuse. *See* SDCL 29A-5-304. SDCL 29A-5-110 excludes nonprofit or public agencies from serving as guardian or conservator if they provide "substantial services or financial assistance" to the protected person. Similarly, an adult individual is excluded from appointment if they are employed by "any public or private agency, entity, or facility that is providing substantial services or financial assistance" to the protected person. SDCL 29A-5-110. In the individual context, this prohibition is waivable if the best interests of the protected person would be served by the individual. However, the theory that for-profit entities are categorically excluded is supported by the court's inability to waive the above prohibition for an entity. Finally, the exception allowing for banks and trust companies to be appointed as conservator is telling. Banks and trust companies would not need to be explicitly included if for-profit entities were available by default for appointment.

[¶54.]     We conclude that SDCL 29A-5-110 does not authorize the appointment of for-profit entities to serve as guardians and conservators except as expressly provided by the provision authorizing the appointment of a bank or trust company as conservator. Accordingly, the circuit court lacked statutory authority to appoint BHA as Gerda's guardian and conservator and we, therefore, reverse the appointment and remand for further proceedings.

### 3. *Whether Roger is entitled to appellate attorney fees.*

[¶55.] Roger moved for an award of $4,430.67 for appellate attorney fees and costs pursuant to SDCL 15-26A-87.3. Charlene did not file a responsive pleading. "The court may award attorneys' fees from trusts administered through the court as well as in probate and guardianship proceedings." SDCL 15-17-38. In our prior decisions addressing appellate attorney fee requests, we have "examine[d] the fee request from the perspective of whether the party's appellate arguments carried any merit." *Bruggeman by Black Hills Advocate, LLC v. Ramos*, 2022 S.D. 16, ¶ 64, 972 N.W.2d 492, 513 (alteration in original) (quoting *Trumm v. Cleaver*, 2013 S.D. 85, ¶ 16, 841 N.W.2d 22, 26). Here we affirmed the court's decision declining to appoint Charlene as guardian and conservator. However, we also held that the court was not authorized to appoint BHA under the language of SDCL 29A-5-110, a position advanced by Charlene. Having determined that Roger's arguments were partially meritorious, we award one-half of his attorney fees request.

### Conclusion

[¶56.] We conclude that the circuit court did not abuse its discretion by declining to appoint Charlene as Gerda's guardian and conservator. We also conclude that SDCL 29A-5-304 does not restrict the circuit court's authority to appoint a third-party guardian or conservator sua sponte where such appointment is in the best interests of the protected person. However, we hold that SDCL 29A-5-110 does not authorize for-profit entities to be appointed as guardians or conservators, with the exception of statutorily qualified banks and trust companies. Therefore, we reverse the circuit court's appointment of BHA and remand for

#30384

further proceedings consistent with this opinion.  Additionally, we award Roger one-half of his requested appellate attorney fees.

[¶57.]        JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.